Shirley Ann HOLLOWAY and Billy G. HOLLOWAY
v. FARMERS INSURANCE EXCHANGE and
UNITED STATES FIDELITY AND GUARANTY
COMPANY

5-5892                                                  481 S.W. 2d 328

Opinion delivered June 19, 1972
[Rehearing denied July 10, 1972.]

*Murphy, Carlisle & Taylor,* for appellants.

*Putman, Davis & Bassett* and *Shaw & Ledbetter,* for appellees.

Conley Byrd, Justice. Appellees Farmers Insurance Exchange and United States Fidelity and Guaranty Company obtained a declaratory judgment holding that appellant Shirley Ann Holloway was not "a resident of the same household" that her husband appellant Billy G. Holloway occupied at the time of her injuries and that Mrs. Holloway was therefore not an insured under the Medical Pay and Uninsured Motorist provisions of the two policies. Mr. and Mrs. Holloway for reversal contend that the Chancellor's findings are contrary to the law and the evidence.

Admittedly Mrs. Holloway would be covered if she comes within the definition of "named insured" contained in the policies.

The Farmers Insurance Exchange Policy defines "named insured" as follows:

"If the insured named in item 1 of the Declarations is an individual, the term 'named insured' includes his spouse if a resident of the same household."

The U.S.F. & G. policy provides:

"NAMED INSURED means the individual named in item 1 of the declarations and also includes his spouse, if a resident of the same household."

The record shows that the marriage of Mr. and Mrs. Holloway had its "ups and downs." Their first marriage to which one child was born resulted in divorce. One child was also born to their second marriage. After moving to Wichita, Kansas, Bill Carlisle moved into the home with them. He continued to live there after his marriage to Alicia. On or about February 15, 1969, Mrs. Holloway in the company of the Carlisles left Wichita to go to Phoenix, Arizona. Admittedly Mrs. Holloway has no realtives in Phoenix. She was injured in an allegedly uninsured motor vehicle on March 29, 1969, while on an outing to some motorcycle races at Yuma, Arizona.

It is admitted that on February 25, 1969, Mr. Holloway signed a complaint for divorce, filed in Kansas on March 10, 1969. Service was had by warning order. On April 25, 1969, while still in the hospital at Fayetteville, Arkansas, Mrs. Holloway filed a petition for separate maintenance in which she alleged that the parties had been separated since December 30, 1968, and that she had been a resident of Arkansas for more than 60 days.

Mrs. Holloway testified that she and her husband were having marital problems and that after some discussion, it was agreed that she would go to Phoenix and get away for awhile. She left on February 15, 1969, with Bill Carlisle and his wife in a Chevelle that she considered to be her car. When she left, her husband was present and gave her $30 or $40. Including the money that she had and what the Carlisles had, they had some six hundred dollars between them. She took only a suit case, leaving the rest of her personal things, a sewing machine, an accordian and furniture. There was an understanding

between her and her husband that the children would go to the grandparents while she was gone. Upon arriving in Phoenix she and the Carlisles lived in different motels, taking their meals in restaurants. In a week or so after arriving in Phoenix, a bartender borrowed her Chevelle for just a minute and wrecked it. Thereafter they purchased a 1950 Ford for transportation. Not long after they got to Phoenix, Bill Carlisle got in trouble with the authorities and was placed in jail. On the week-end of the accident, Mrs. Carlisle, because of her pregnancy, had gone back to her folks. Before leaving, however, Mrs. Carlisle and Mrs. Holloway had agreed that Mrs. Holloway would contact Bill Carlisle the following Monday, after which she was to return to Wichita. Mrs. Holloway explained that she had not talked directly with Mr. Holloway while she was in Phoenix but that she had done so indirectly through a mutual friend. When asked why she used the mutual friend she replied: "That was the whole purpose of going out there was to be away from each other and not talk to each other for awhile." With reference to how long she was to be in Phoenix the record shows:

"Q. When you left for Phoenix in the latter part of February of '69, had you and Mr. Holloway discussed how long you would stay separated?

"A. Yes.

"Q. How long was that?

"A. I was to be out there approximately two weeks.

"Q. As it turned out, you stayed longer, it that correct?

"A. Yes.

"Q. Did Mr. Holloway know why it was necessary for you to stay longer than two weeks?

"A. Yes. Betty called him and told him that Billy was in trouble."

While in Phoenix Mrs. Holloway became acquainted with Virginia Andrews. At the suggestion of Virginia she went with a group to the motorcycle races at Yuma, Arizona. She had not met any of the group except Virginia before that time. Enroute to Yuma, on a Saturday, she was injured and did not remember anything thereafter until the following Tuesday, when she saw her husband standing over her bed. Mrs. Holloway was transported by air ambulance from Arizona to Fayetteville, Arkansas. At Fayetteville, Mr. Holloway visited her every week-end, —commuting from Wichita where he was employed. On April 25, she learned for the first time that her husband had filed the divorce suit in Wichita. Because he wanted to take the children from her parents' home in Fayetteville to Wichita she called her lawyer and asked him to do something to keep the children from being removed from the state. As a result of that call, the separate maintenance suit set out above was filed. Admittedly Mr. & Mrs. Holloway are now living together.

Mr. Holloway testified that his wife left on February 15, 1969, with the Carlisles taking the Chevelle and only one suit case. Her leaving had been discussed and he was present at the time,—in fact he gave her $30 or $40. Before she left he had called her mother and made arrangements for the grandparents to keep the children while she was gone. Mr. Holloway admitted that he and his wife had not seen eye to eye on a lot of things and when asked what led up to the Phoenix trip, he stated:

"Well, she said she more or less kind of wanted to get away for awhile and see just exactly—you know— what she wanted to do, whether or not she wanted to go ahead with her marriage or whether or not we would terminate it, so this is where this Phoenix trip come about."

According to Mr. Holloway, Mrs. Holloway left on more or less friendly terms with the understanding that she would be back in two or three weeks. At the time she left, she took only one suitcase, leaving her wig, accordion, etc. Other than the indirect communication with Bill Carlisle's sister Betty, he did not hear from

her until the accident. As soon as he heard of the accident, he flew out to Arizona to be with her. He filed the suit for divorce before he heard that Bill Carlisle had gotten into trouble with the law. With reference to the filing of the divorce the record shows the following:

"Q. Now when you went to the lawyer to file suit for divorce, I take it that at that time you had made up your mind that you did not want to stay married to Shirley?

"A. Well, not really. I more or less filed that divorce, I think, because she'd actually stayed away longer that what we'd really planned and I was kind of mad. I guess I wanted to show my authority or something."

Appellees, to support the Chancellor's declaratory judgment decree, rely upon *Couch on Insurance,* 2d § 42: 78 and the case of *Neidhoefer* v. *Automobile Ins. Co. of Hartford, Conn.* (7th Cir. 1950), 182 F. 2d 269. Both authorities equate "residing in the same household" and similar policy provisions as referring to domicile. See also *Central Manufacturer's Mutual Ins. Co.* v. *Friedman,* 213 Ark. 9, 209 S.W. 2d 102 (1948). Both *Couch* and the *Neidhoefer* case recognize that the controlling issue in determining coverage under such policy provisions is the intent possessed by the departing member of the family. In other words, the departing spouse remains a resident of the household unless the intent of the departing member be that the household be disrupted or his domicile therein be terminated.

In the *Neidhoefer* case, the parties separated September 12, 1946, the departing spouse commenced her separate maintenance action on October 3, 1946, and at the time of the loss on December 9, 1946, she had taken up her abode elsewhere—in fact making a claim for the losses she stated: "My income is from separate maintenance from my husband. . .from whom I have been separated from since and living apart since September 12, 1946." In holding that Mrs. Neidhoefer was not a member of the family household on December 9, 1946, the court stated:

"We think that the important and perhaps controlling feature in situations of the instant character is the intent possessed by the departing member of a family. Of course, it is not difficult to visualize a situation where a wife might leave the home for a considerable time and still retain her status as a member of the family and the household, for instance, if she was away on a visit or for some other purpose. In such a situation the separation should be not only with the consent of the husband but with the intent on the part of the wife to return. In the instant case, however, we see no reason to think or infer that Mrs. Neidhoefer, when she separated from her husband and home on September 12, 1946, had any intention other than making such separation permanent."

Here there is no showing that Mrs. Holloway had taken up an abode other than the one she had with her husband. The fact that the children were left with the husband with an understanding that Mrs. Holloway's mother would take care of them while she was gone is a very cogent indication that the trip to Phoenix was of a temporary nature.

When the record is viewed from this standpoint together with her testimony and that of her husband that she departed on the trip to Phoenix only for the purpose of getting away for awhile, we find the Chancellor's holding that she was not a resident of the household at the time of the accident is contrary to both the law and the evidence.

Reversed.

BROWN, FOGLEMAN and JONES, JJ., dissent.

JOHN A. FOGLEMAN, Justice, dissenting. I cannot agree that the chancellor's holding in this case was contrary to either the law or the evidence. In the first place, I do not see how a question of law is involved. Even if the policy clause is properly construed as strongly against

the insurers as the majority construes it, the only question before this court is whether a fact finding made by the chancellor is clearly against the preponderance of the evidence. I have no quarrel with the construction of the policy, but I do not agree, as the majority seems to suggest, that a wife is a resident of her husband's household, as a matter of law, until the parties are divorced. I also disagree on the question of the preponderance. I think that the majority has given the post-accident, post-reconciliation, self-serving testimony of the interested parties full weight and given no attention to the evidence that should be determinative, i.e., the actions and declarations of the parties before the unfortunate collision. I submit that the chancellor was perfectly justified in finding the actions of these parties to carry substantially greater weight than the testimony upon which the majority relies. What the Holloways did speaks so loudly, I do not see how a court of equity can hear what they now say, or a chancery court can be held in error for not doing so.

The decree before us contains this recitation:

That the defendant, Shirley Ann Holloway, was not a resident of the household of the defendant, Billy G. Holloway, also known as Bill Holloway, on March 29, 1969, and was not on said date an insured under Policy No. 0429244618 issued by Farmers Insurance Exchange nor under Policy No. AF8608367 issued by United States Fidelity and Guaranty Company.

The chancellor made specific findings of fact. They include the following:

I have no difficulty in finding, under the proof offered, that Mrs. Holloway was not a resident of the household of Mr. Holloway at the time the wreck took place and this casualty occurred. I'm not unmindful of the deposition testimony both of Mr. and Mrs. Holloway that they really weren't serious about their respective divorce actions, and that the separation was a friendly sort of thing, and more for the

purpose of working out simmering problems than evidence of a genuine breach; still they cannot get around their respective divorce complaints. Mr. Holloway filed his complaint for divorce some 25 days after Mrs. Holloway left, and absent other evidence, assuming that evidence would be proper, I am constrained to assume that it stated a good cause of action under the laws of Kansas.

It's true that Mrs. Holloway didn't file her suit for divorce until after the accident. and at a very close period of time coincident with what Mr. Holloway says was their actual reconciliation, April 25th. Still, her divorce complaint alleges a separation either in early January or the latter part of December, December 30th, and contains recitations which stated a cause of action under the laws of Arkansas.

Now, I don't think either one of them, after the fact, can look back and say, "Well, we really didn't mean that. We really weren't separated. We really weren't mad at each other, and we really weren't serious about these divorce cases"; because in truth and in fact, they were living apart. There is some question as between the two divorce complaints as to how long they lived separate and apart. She says from December 30th to April 25th, and he says from February 15th to March 10th, 30 to 60 days difference. In any event, they were, according to their respective sworn statements, living separate and apart, each alleging grounds which, if proved, would entitle both to a divorce during the period before, at the time of, or subsequent to, the automobile accident.

So, as I say, if you stop there, there is no problem about the findings, and I do find that Mrs. Holloway was not a resident of the same household in the language of the USF&G policy, and the same language in the Farmers policy, a resident of the same household. * * *

* * * But with the definition of relative in Parts I of the respective policies, which is carried down into

the uninsured motorist section, I think it makes it clear, with a factual finding that Mrs. Holloway was not a resident of her husband's household at the time of the accident. I feel that she was not an "Insured" under the uninsured motorist coverage.

I submit that a clear preponderance of the evidence actually supports the chancellor's findings, and that the findings were certainly not clearly against the preponderance of the evidence.

Mrs. Holloway was a native of Arkansas, and only left the state when she and her husband moved to Wichita in February 1968. Almost as soon as they were established there, Billy Carlisle, a friend of Mrs. Holloway, moved into their home and later brought a bride there. The Holloways even moved into a larger house in order to accommodate him. Difficulties soon arose between the Holloways, and, for some reason, not satisfactorily explained, Mrs. Holloway decided that she needed a vacation from her husband of approximately two weeks which was to be taken in the company of the Carlisles in Phoenix, Arizona. According to Mr. Holloway, she proposed that each make up his mind, during her absence, whether to stay married or not. She took an automobile, which she considered hers, and a sum of money which had been augmented by her husband's contribution of $30 to $40 and left, taking the Carlisles, sometime about February 15, 1969. Strangely enough, Billy Holloway testified that a Dodge automobile on which one of the insurance policies involved had been issued should have been "titled" in Carlisle's name. Mrs. Holloway admitted that there was then a possibility that she would divorce Bill Holloway when she left. During this brief vacation and while she and the two Carlisles were hopping from one motel to another and Billy Carlisle was looking for employment, she became so well acquainted with a bartender at a bar and restaurant which she and her companions frequented that she loaned her car to him for "just a minute," during which time he completely wrecked it. She testified that "we" then bought a 1950 model Ford automobile for transportation. It was in late February or early March 1969 that Billy Carlisle got into

trouble with the Arizona authorities, as a result of which he was forced to leave the motel where his wife and Shirley Holloway were staying. Just why this required Shirley Holloway to extend her "vacation" from two to six weeks remains a mystery. We are not favored with any information as to what Shirley Holloway did, proposed to do, or could do to help Carlisle extricate himself from the toils of the law, particularly after Carlisle's pregnant wife had to come back home, and she stayed to get him "squared away." At any rate, she was not so involved in this undertaking that she was unable on March 29, 1969, to attend the motorcycle races at Yuma, whither she was bound with newly acquired friends, male and female, on the date of the tragic accident.

Meanwhile, Billy Holloway had taken in another single male roomer two weeks after his wife left. Because of the marital difficulties he had also employed a lawyer to file a divorce suit. Holloway's affidavit verifying his complaint was dated February 25, 1969, but the suit was not filed until March 10, 1969, at which time either a two-or-three-week "vacation" should have been terminated. Billy Holloway said he filed the suit because Shirley had stayed away longer than planned. He verified, under oath, his allegation that Shirley had left his home on February 15. He said that, as far as he was concerned, he had done all he could do and it was all over when he left the lawyer's office. It only remained, he said, for the lawyer to pursue the necessary procedures and advise him when he was a divorced man. He admitted that, regardless of his present intentions, he was serious about the filing of the suit.

Billy Holloway did go to Phoenix when he learned of Shirley's injuries. Still she did not return to his domicile, even after her release from the hospital in Phoenix. She went to her native residence, first to Washington General Hospital in Fayetteville, where she had lived before going to Wichita, and then to her parents' home, also in Fayetteville. This was also the place where her children were, pursuant to agreement between their parents at the time the "vacation" was proposed by Mrs. Holloway. Billy told Shirley while she was a patient in

the Fayetteville hospital that he had filed a divorce suit. It does not appear that there had been any serious discussions relative to the deteriorated marriage and its rehabilitation until that time. Billy made weekend visits to Fayetteville during this period, and thereafter the two discussed the situation. Shirley referred to her first return to Wichita by saying "we were back together," and the discussions between her and her husband were referred to as talking about whether they would go back together. She admitted, to say the least, that there was still uncertainty about the matter until after she filed her divorce suit. Billy Holloway described the conversations in the same terms. Even when she did go to Wichita with him, it was on the basis of a trial reconciliation, according to Billy.

Before this trial reconciliation, both Holloways had to dismiss divorce suits in which a separation had been alleged. Shirley Holloway testified that as soon as Billy told her of his suit, she called her lawyer and asked him what to do about it, particularly in view of the fact that she was convinced that Billy was planning on taking the children back to Wichita. She testified that she told the lawyer that she wanted him to represent her in the pending divorce suit and that the lawyer suggested the possibility of a countersuit if that was what she wanted to do. Surely it was no mere coincidence that she alleged residence for the requisite period in the place she had lived until the removal to Wichita, the place where her children had been since the commencement of the "vacation" and the place to which she returned after being injured.

It also seems significant that Mrs. Holloway only conveyed word of her whereabouts to her husband through Billy Carlisle's sister, but never an intimation of any intention to return to his domicile.

We have, on many occasions, given the ancient proverb "actions speak louder than words" judicial sanction. As recently as *Charisse* v. *Eldred,* 252 Ark. 101, 447 S.W. 2d 480, we said:

It is true that the question of intention is one of fact.

*Phillips* v. *Melton,* supra.[1] Appellant places great reliance upon his own declarations of intention. The question of intention, however, is to be ascertained not only by statements of the person involved by his conduct concerning his "voting" residence. *Phillips* v. *Melton,* supra. We have recognized that circumstances may belie protestations of purpose and that the fact finder is not bound to accept the claims of intent when the circumstances point to a contrary conclusion. *Williams* v. *Dent,* 207 Ark. 440, 181 S.W. 2d 29. The declarations of the person whose domicile or residence is in dispute may be for a self-serving purpose and are sometimes called the lowest species or quality of evidence on the subject. * * * [Citing cases.] They cannot prevail unless borne out by acts. See *Hogan* v. *Davis,* 243 Ark. 763, 422 S.W. 2d 412; *Pike County School District* v. *Pike County Board of Education,* 247 Ark. 9, 444 S.W. 2d 72; 28 C.J.S. 45, Domicile, § 18. When acts are inconsistent with a person's declarations, the acts will control, and declarations must yield to the conclusions to be drawn from the facts and circumstances proved. * * *[Citing cases.]

The place of exercise of one's elective franchise is not necessarily conclusive as to one's intent on the question of domicile or residence for voting purposes, but it is certainly important, and may be the most important evidence on the subject. * * * [Citing cases.] In *Hogan* v. *Davis,* supra, we said that by executing a voter registration affidavit in another state the registrant had left the matter of his residence" not seriously open to doubt.

We had little trouble in applying the principles above stated in such cases as *Hogan* v. *David,* 243 Ark. 763, 422 S.W. 2d 412. I. do not see why they are not applicable here. I would affirm the decree.

I am authorized to state that Mr. Justice Brown and Mr. Justice Jones join in this opinion.

---

[1]222 Ark. 162, 257 S.W. 2d 931