25 P.3d 451 (2001)
106 Wash.App. 745
Blake Curtis MATTHEWS, Appellant,
v.
PENN-AMERICA INSURANCE COMPANY, Respondent.
No. 24387-3-II.
Court of Appeals of Washington, Division 2.
June 15, 2001.
*452 Stephen Thomas Carmick, Chehalis, for Appellant.
Charles C. Huber, Lane Powell Spears Lubersky, Seattle, for Respondent.
ARMSTRONG, C.J.
Twenty-four-year-old Blake Curtis Matthews was seriously injured in an auto accident in August 1994. At the time, he was living in his mother' home; Ray Edinger, the mother's boyfriend, also lived in the home. Edinger had an auto insurance policy with Penn-America, which included as an insured a "member of the family who is a resident of the household." The question is whether Matthews was a member of Edinger's family, entitled to underinsured motorist coverage under Edinger's policy. The trial court granted summary judgment for Penn-America and Matthews appeals. We affirm, holding that the average purchaser of insurance would not consider Matthews to be a member of Edinger's family.

FACTS
Blake Matthews' biological parents have been divorced for years. In 1989, Edinger started living with Sue and Blake in Tenino. Shortly thereafter, Sue, Edinger and Blake moved to a home Sue purchased in Olympia. Edinger has continued to live with Sue since then but the two have not married and Edinger has not adopted Blake.
Until 1993, Blake lived in the Olympia residence "except for the occasional night he would spend somewhere else." CP at 20. Edinger recalled that Blake was "in an apartment in Centralia for a period of time" and also "in Olympia with his girlfriend." CP at 129. In December 1993, Blake co-signed a lease on an apartment with his girlfriend and they moved in together along with their son. In the rental application, Blake listed Sue as his parent and listed Edinger, with Sue's Olympia address, as his current landlord. Blake took most of his belongings and his room became a "catch all room for storage." CP at 157, 159. Three or four months before the accident, Blake broke up with his girlfriend and returned to his mother's house.[1]
At the time of the auto accident, Edinger's Penn-America auto insurance policy provided underinsured motorist coverage for the person named in the policy. That person is described as follows: "You, your, yourself means the person named on the Declarations page and includes the spouse if a resident of the same household. This also means a member of the family who is a resident of the household and includes a ward or foster child." CP at 30.
In November 1997, Matthews sued Penn-America, claiming that he was an "insured under the terms of [Edinger's] policy for purposes of the uninsured motorist coverage provided." CP at 1.

ANALYSIS
The interpretation of language in an insurance contract is a question of law. Rones v. Safeco Ins. Co., 119 Wash.2d 650, *453 654, 835 P.2d 1036 (1992); Grange Ins. Co. v. Brosseau, 113 Wash.2d 91, 95, 776 P.2d 123 (1989). Where the language in a contract for insurance is clear and unambiguous, the court should enforce the policy as written. Allstate Ins. Co. v. Peasley, 131 Wash.2d 420, 424, 932 P.2d 1244 (1997).
A term or phrase is ambiguous only if the language on its face would be fairly susceptible to two different but reasonable interpretations by an average insurance purchaser. Peasley, 131 Wash.2d at 424, 932 P.2d 1244. If an ambiguity is found, it is construed against the insurer. Peasley, 131 Wash.2d at 424, 932 P.2d 1244; see also State Farm Mut. Auto. Ins. Co. v. Ruiz, 134 Wash.2d 713, 718, 952 P.2d 157 (1998) (construing inclusionary clauses liberally in favor of coverage if the person can reasonably be embraced within the terms of the clause). Blake contends that the word "family" is ambiguous and should be construed broadly in his favor to afford coverage.
Neither the term "family" nor the phrase "member of the family" is defined in the policy. Generally, undefined terms are given their plain, ordinary, and popular meaning as would be understood by an average purchaser of insurance. Peasley, 131 Wash.2d at 424, 932 P.2d 1244. When words in a policy are undefined, courts look to the dictionary to determine the words' common meaning. Peasley, 131 Wash.2d at 425-26, 932 P.2d 1244. The meanings of "family" range from "a group of persons connected by blood, by affinity, or by law"[2] to "a group of people who live, sleep, cook, and eat upon the premises as a single housekeeping unit."[3] The question is whether the average purchaser of insurance would reasonably read Penn-America's language to intend coverage for the traditional group connected by blood, affinity or law, or for the more broadly defined group of people who live ... upon the same premises. If "family" is construed broadly, Blake would be covered because he, his mother, and Edinger lived together under the same roof for most of the five years before his 1994 accident. But if "family" is read in the more limited traditional sense, Blake would not be covered because he was not related by blood, affinity, or law to Edinger. We conclude that, in the context of Penn-America's policy, the average purchaser would read "family" in the traditional, "connected by blood, affinity, or by law." Thus, Blake was not covered as a family member.
First, the Supreme Court has said that although the word "family" can be used synonymously with the broader term "household," the most common use of "family" "convey[s] the notion of some relationship blood or otherwise," noting that "[i]n its most common use, the word implies father, mother and childrenimmediate blood relatives[.]" Collins v. Northwest Cas. Co., 180 Wash. 347, 352, 39 P.2d 986, 97 A.L.R. 1235 (1935). Although this does not foreclose further analysis of the meaning of "family," the most common use is, by definition, the meaning an average insurance purchaser is most likely to consider.
Second, if "family" means all those who live under one roof, Penn-America's requirements that an insured be both a family member and a resident merge. Blake would be a family member because he lives with Edinger. And he would be a resident of the same household because he lives with Edinger. Thus, simple residency would establish coverage and "family" and "resident" would merge; the word "family" would have no independent meaning. But we construe the language of an insurance policy to give meaning to all the words of the policy if possible. Boeing Co. v. Aetna Cas. & Surety Co., 113 Wash.2d 869, 876, 784 P.2d 507 (1990). This we can do only by assigning some meaning to "family" beyond residency. In short, "family" must further qualify the definition of "insured" beyond the qualification imposed by residency.
Third, Penn-America tells the policyholder that a spouse is insured if a resident of the same household, and that a ward or foster child is included in the definition of "family." But if "family" is defined broadly to include *454 Edinger's girlfriend, it surely would include a spouse and the language specifically extending coverage to a spouse would be unnecessary. And if "family" includes the adult son of Edinger's girlfriend, it surely would include a ward or foster child. Thus, these specific references would be unnecessary. The words would simply repeat those persons already included in the broad definition of "family." But then the words "ward" and "foster child" are meaningless. On the other hand, "spouse," "ward," and "foster child" do have meaning if "family" is limited to those connected by blood, affinity, or law. The words then mark the outer boundary of "family." They tell the insured that a spouse, although not connected by blood, is covered as part of "you, your, and yourself;" further, that wards and foster children, although not connected by blood, are included in family because they are connected by law to the named insured. Thus, the specific references to spouse, ward, or foster child strongly point to the traditional family definitionthose connected by blood or law.
Moreover, these references bring the word "family" very close to, if not identical to, the phrase "immediate family," which has been held to exclude a meretricious partner. Continental Cas. Co. v. Weaver, 48 Wash.App. 607, 612, 739 P.2d 1192 (1987). And if the word excludes a meretricious partner, it surely excludes the adult son of a meretricious partner.
We conclude that the definition of "family" in Penn America's policy includes only those persons related to the policyholder by blood, affinity, or law. Blake Matthews, who is unrelated to Edinger by either blood or law, is not included.
We address briefly the reasoning of the dissent. The dissent agrees that in construing "family" we must consider the context in which it is used. But the dissent then states that context includes "the meanings that society attributed to the word at the place and time of its use." This, of course, simply opens the dictionary to every possible meaning of "family." And, with dictionary in hand, it is easy for the dissent to conclude that "family" has a variety of reasonable meanings and that Penn America's "family," construed in favor of coverage, is broad enough to include the adult son of the insured's girlfriend.
The flaw in this argument is the misuse of "context." If "context" means all the possible dictionary definitions, it is meaningless. To be meaningful, context must refer to the context of Penn-America's policy. Thus, we consider all appropriate dictionary meanings of "family" and then look to the words and phrases surrounding "family" in Penn-America's policy to guide us to the meaning of "family" in that context. And this requires us to consider the limiting effect of Penn America's use of "spouse," "ward," and "foster child."
Moreover, by using "context" to include all possible dictionary definitions, the dissent fails to heed the Supreme Court's warning against simply surveying dictionary definitions. Mains Farm Homeowners Ass'n v. Worthington, 121 Wash.2d 810, 854 P.2d 1072. Mains involved the interpretation of "family" in the context of restrictive covenants allowing only "single family residences." The homeowners association sought to enjoin the defendant from operating an adult family home business within the development. The Supreme Court affirmed the trial court's grant of an injunction, but cautioned against a mechanical survey of possible dictionary definitions to find the meaning of "family:"
No purpose will be served by examining and comparing in detail the numerous cases which define "family." Because of the widely differing documents being interpreted, the contexts in which the word is used and the fact-specific circumstances, it is impossible to arrive at a single, all-purpose definition. The possible definitions range from limiting the "family" to the historical, traditional persons related by blood, marriage or adoption to "a group of people who live, sleep, cook, and eat upon the premises as a single housekeeping unit."
Mains, 121 Wash.2d at 817, 854 P.2d 1072.
And later, the court quoted from a law review article: "First, although a group home may meet one of the dictionary definitions *455 of `family,' the focus must be on the contextual meaning of the word rather than the range of linguistically permissible meanings." Mains, 121 Wash.2d at 817, 854 P.2d 1072 (quoting BRUSSACK, GROUP HOMES, FAMILIES, AND MEANING IN THE LAW OF SUBDIVISION COVENANTS, 16 GA. L.REV. 33, 42, 44 (1981-1982)).
The same is true here. The general context here is insurance coverage.[4] The specific context is the language of Penn-America's policy. And Penn-America's policy, as we have already discussed, contains three important limiting words: "spouse," "ward," and "foster child."
The dissent argues that the average insurance purchaser could read "spouse," "ward," and "foster child" as either inclusionary or exclusionary, and that if read as inclusionary, the words do not preclude other family members from being insured. Although true, this misses the point. Penn-America's use of "spouse," "ward," and "foster child" suggests that "family" means the traditional blood relations, extended to include those whose family ties are created by operation of law. Otherwise, the words are meaningless and unnecessary.
Finally, the dissent does not address the merger problem that exists under its definition of family, i.e., Blake is both a member of Edinger's family and a resident of Edinger's household because he lived in the Edinger's household. Thus, residency satisfies both elements and "family" has no independent meaning.
We conclude that the average purchaser of insurance would not understand the word "family" as used in Penn-America's policy to include the emancipated 24 year old son of a woman with whom the insured lived.
I affirm.
SEINFELD, J. (concurring)
I concur with the majority's conclusion that based on the context in which the phrase "member of the family" appears, and based on the other language set forth in the declaration describing the insured, the average purchaser of this insurance policy in 1994[5] would have understood that the policy covered only the purchaser and those individuals connected to the purchaser by blood, affinity, or law. I write separately in an attempt to clarify why it is inappropriate to apply the very broad definition of "member of the family" advocated by the dissent.
The first and essential question before us is: Would the average purchaser of such a policy at that time reasonably have understood the phrase "member of the family," as the policy uses that term, to include another adult living in the same residence as the insured at the time of the accident who was unrelated to the insured by blood, affinity, or law? Kitsap County v. Allstate Ins. Co., 136 Wash.2d 567, 575, 964 P.2d 1173 (1998); Allstate Ins. Co. v. Peasley, 131 Wash.2d 420, 424, 932 P.2d 1244 (1997). I believe that the answer is no and that the phrase, "member of the family," in the insurance policy context here, is unambiguous. Thus, the various other possible definitions provided by the dissent are immaterial and create ambiguity where none exists. See Kitsap County, 136 Wash.2d at 576, 964 P.2d 1173.
Although the dissent verbalizes the necessity of considering the language at issue in context, it looks to very dissimilar contexts to support its ambiguity conclusion. First, it notes the multiple dictionary definitions, an exercise that does not promote the context discussion. It then turns to the case of Mains Farm Homeowners Ass'n v. Worthington, 121 Wash.2d 810, 854 P.2d 1072 (1993), in which the Supreme Court grappled with a restrictive covenant limiting the use of property to "single family residential."
Looking to the intent of the parties, the Mains court held that unrelated adults residing in an adult family home did not constitute a "family" and, thus, the operation of such a home would violate the covenant. The Mains court first notes that
*456 No purpose will be served by examining and comparing in detail the numerous cases which define "family". Because of the widely differing documents being interpreted, the contexts in which the word is used and the fact-specific circumstances, it is impossible to arrive at a single, all-purpose definition.
121 Wash.2d at 817, 854 P.2d 1072. It then briefly explores "the possible definitional spectrum" before turning to the specific context at issue. The opinion discusses the details of the adult home, the reasonable expectations of other lot owners, and the language in the covenant that focused on the purpose of the property use as opposed to the nature of the structure on the property.
After concluding that, in context, this was not a family home, the Mains court provided the following cautionary note, which is applicable here:
We caution that the interpretation of a particular protective covenant is largely dependent upon the facts of the case at hand. Our holding should not be construed as an encompassing declaration concerning covenants and uses under other circumstances.
121 Wash.2d at 827, 854 P.2d 1072. Nonetheless, the dissent cites and quotes Mains as authority for a definition broader than "persons related by blood, marriage, or adoption." Dissent, at 464. I believe this approach takes language and facts out of context and does not look at the facts before us in context.
The dissent next turns to a 1935 case, Collins v. Northwest Cas. Co., 180 Wash. 347, 349, 39 P.2d 986 (1935), which involved the interpretation of the phrase "an adult member of the named Insured's household," as used in an automobile insurance policy. The issue in Collins was whether the "household" survived the death of the insured. In its discussion of the various meanings for the word "household," the Collins court notes that "household" suggests a different meaning than does "family." This dicta neither provides context for the case at hand nor shows that the word "family" is ambiguous in the insurance policy context.
Finally, the dissent's reliance on the author of a 1960 anthropological "work" is not persuasive. The Murdock description of the family as a "social group" contains no clue as to context. We can only assume from its anthropological orientation that its context is universal and nonspecific, the exact opposite of the relevant context in this insurance policy case. See WEBSTER'S THIRD NEW INT'L DICTIONARY 93 (1969).[6]
The variety of potential meanings of "family" outside the context of the insurance policy at issue does not justify a conclusion that the relationship between Ray Edinger and Blake Matthews falls within a reasonable definition of "family." As the dissent acknowledges, we do not look at the various potential definitions for a word in an insurance policy unless the average purchaser would understand the word, as used in the policy rather than viewed in isolation or in other contexts, to have multiple meanings.
The majority looks at the "common meaning" of family to determine how the average purchaser would understand the policy. This method is consistent with Peasley, 131 Wash.2d at 425-27, 932 P.2d 1244, and supports the majority's holding. The dissent challenges this approach, contending that because of the absence of a definition in the policy, the average purchaser "would not have understood that Penn-America's policy adopted nor eliminated, expressly or impliedly, any other meaning of the word `family.'" Dissent, at 465. Assuming that the dissent is saying that the policy included any meaning of family other than one defined solely by residency, it fails to demonstrate that the average purchaser would find those multiple potential meanings applicable in this context.
The majority's effort to interpret and clarify each clause in the policy, here specifically "member of the family" and "resident of the household," is a helpful and reasonable methodology. Boeing Co. v. Aetna Cas. & *457 Surety Co., 113 Wash.2d 869, 876, 784 P.2d 507 (1990). The fundamental difference between the majority and the dissent is that the dissent would define as family members those individuals connected to the insured through a pseudo-family relationship because they are similar to the relationships within the definition. But good friends who enjoy each other's company and live under the same roof do not become family members simply because their friendship has certain familial characteristics such as affection, caring, and companionship.
This case involves an even more remote relationshipa member of the family of a pseudo-relative. To describe this legal relationship as a family does not clarify ambiguity, instead it creates ambiguity where none exists. Thus, even assuming that the evidence adduced at trial was sufficient to prove that Sue Matthews was Ray Edinger's meretricious spouse, the dissent points to nothing in the law or in the public policy of this state in 1994 that would automatically make all resident members of Sue's family also members of Edinger's family for insurance coverage purposes.
Because I believe that the average purchaser of this policy in 1994 would have understood this phrase to mean only individuals related to the insured by blood, affinity, or law, and not to roommates or good friends living together, I join the majority in affirming the trial court.
MORGAN, J. (dissenting)
Penn-America had every right to state, in its policy language, that the word "family" would include only persons related by blood or law.[7] It did not do that. As a result, an average purchaser of insurance would have understood at least one reasonable meaning of the word "family" to encompass the stable social group maintained by Ray Edinger (Ray), Sue Matthews (Sue), and Blake Matthews (Blake).[8] We are obligated to adopt that meaning, and thus to find coverage.
The trial court granted summary judgment to Penn-America, so we must view the record in the light most favorable to Blake.[9] Because the lead opinion declines to do that, I must restate the facts.
On January 18, 1970, Sue gave birth to Blake. Except as noted below, she and Blake lived together from then until the trial court entered judgment. She and Blake's biological father divorced when Blake was a boy.
In 1987, Sue and Blake lived together for the entire year. She started dating Ray, but Ray did not live with her or Blake.
In 1988, Sue and Blake lived together except for "maybe March, April, May."[10] During those three months, Blake lived alone in an apartment in Chehalis. In May, he "boomeranged" back to Sue's.
In 1989, Sue and Ray commenced a stable domestic relationship that is still ongoing. Blake was living with Sue before Ray moved in, and Blake continued to live with Ray and Sue after Ray moved in. The three resided in Tenino in 1989, then moved to Olympia in 1990.
From 1989 to December 1993, Ray, Sue, and Blake all lived together, except for the occasional night on which Blake would stay at his girlfriend's. In December 1993, he and his girlfriend leased an apartment together, but their tenancy was short lived. In April or May 1994, he again "boomeranged" back to Sue and Ray's.[11] In August 1994, he was injured in the accident at issue here.
*458 From 1989 to the present, Sue, Ray, and Blake have maintained relationships that can best be described by quoting their declarations. Sue's declaration states:
Ray Edinger and I have lived together since 1989 or so. We are totally committed to each other but we aren't married. However, we very definitely think of ourselves and the children as a family. We intend to go on together into the future. When Ray first moved in with me, Blake and I were living on Silver Creek Drive, near Tenino, Washington. When we moved to the house on Westley Drive, Blake moved with us. In 1990, I was paralyzed from the waist down in an auto accident. Both before and especially since that time, Ray used his income to support the family. His money went for food and taxes and utilities and payments, just like it was community funds. We have also had a joint bank account.
At the time Ray moved in with us, Blake had quit high school, but was still living at home. He and Ray went through a difficult adjustment period, but they were successful and became good friends. Blake never called Ray "daddy" or "dad" or anything like that. He was too old for that. However, he learned to respect Ray and Ray acted like Blake was a member of his family.
Blake lived with us non-stop, except for the occasional night that he would spend somewhere else, until 1993. At that time, he moved in with his girlfriend.... He still kept a room at our house, however. He had clothes and furniture and things in it. He would get his mail at our house, and he came to pick it up regularly. Our house remained his permanent residence.
Blake broke up with his girlfriend three or four months before the accident and moved back into our home again. There was no special thing to it, it was just his home and he was moving back in. Ray and I hoped that he would get a good, stable job and set up his own home, but there was no time limit set as to how long he could stay there or anything like that. It was just an indefinite thing, until Blake had his accident. At that point, he had been living with us as a family again for three or four months.[12]
Blake's declaration states:
My mother and father were divorced when I was a boy. Back in about 1987, when I was 17 or so, Ray Edinger started dating my mother, and then he moved in with us. Since then, we've lived as a family, even though my mother and Ray never got married.
Ray and my mother and I lived together, first on Silver Creek Drive near Tenino then at 3604 Wesley Drive NW, Olympia, Washington. That was my home.
Because I was a teenager when Ray and my mother moved in together, I didn't call Ray "dad" or anything like that, but we became friends. We had arguments, but usually over stupid kid stuff that I did. Despite these arguments, Ray and I became friends.
Ray and I worked together on things around the house and he would help me fix my cars. He let me drive his pickup truck, and go get firewood together. We went fishing together a lot. Ray and my mother and my sister were the only family I had or have.
Sometime before the accident happened, I had moved in with ... my girlfriend. I don't remember exactly when that was. However, I know I never really moved out of my mother's house. I still had my own room. A lot of my clothes were still there. My furniture was still there, including my TV, my stereo, my dresser, my fan, my table and other things. My mother and Ray's address was still on my driver's license and voting registration. I still got my mail at the house my mother and Ray lived in. It was my home, my permanent one.
I broke up with [my girlfriend] sometime before the accident, but I can't remember when. I know I was living with my mother and Ray again at the time of the accident. After I got out of the hospital, I came back home again. Ray and my mother took care of me for many, many *459 months before I was able to take care of myself again. They did this because they are my family.
My mother is disabled, so Ray has supported me, both before my accident and since. He's the one who has the job and the income to make the payments and buy the things that our family needs.[13]
Ray's declaration states:
I live with Sue Matthews, who is the mother of Blake C. Matthews. Sue and Blake and I have lived together as partners since 1989. Sue is now totally disabled from an auto accident she had in 1990. However, we are still living together and intend to go on living together forever. We think of ourselves as being a family.
Because Sue can't work, I am the only one that earns any income. We have always have [sic] used my income to support the family, just as if we were married.
Blake has been a member of our family right along. Because he was already a teenager, he and I tangled a couple of times, mainly because he wouldn't clean up after himself and didn't do as much work around the place as I thought he ought to. However, we got past that. Even though Blake knows I'm not his father, we became friends. We've worked on cars together and done household chores together. We've gone fishing together many times. We've cut firewood and gone shopping together. Sue, Blake and I have gone to the beach together as a family. I even let Blake drive my pickup truck when his car wasn't running.
Blake was living with us when he had his accident and had been for three or four months. He'd been out of the home for a few months, staying with a girlfriend of his, but he never really made that his permanent residence. He still had a room at our house, and kept his furniture and most of his clothes there.
When I got my insurance company policy from Penn-American [sic] through the Olympia Insurance Agency, I understood the UIM part of the policy to mean that it would cover anybody in our family. That is, it would cover me or Sue or Blake, since we all lived together as a family. I know that I explained to the agent that the 1988 Dodge, the 1986 Chevrolet and the 1981 Buick were either partly or totally owned by Sue Matthews. We had purchased some of these vehicles together, using her money as well as mine.
After Blake was hurt in the accident, he came home to live with us again. His mother and I took care of him until his injuries, including his brain injury, had improved to the point where he could take care of himself. Sue and I are very much Blake's family, the only real family he has got.[14]
Read together and in the light most favorable to Blake, these declarations show that in and before 1994, Blake was what is sometimes called a "boomerang kid." Like many young people who live with their parents off and on after age 18, he was expected "to help out around the house";[15] he ate groceries that Ray and Sue furnished; and he sometimes contributed "rent" of "around a hundred a month."[16]
In August 1994, Ray purchased a policy of automobile insurance from Penn-America, effective for six months commencing August 13, 1994. The policy provided that Penn-America would "pay the damages for bodily injury and property damage which you are legally entitled to receive from the owner or *460 operator of an underinsured motor vehicle."[17] The policy defined "you" as follows:
You ... means the person named on the Declarations page and includes the spouse if a resident of the same household. This also means a member of the family who is a resident of the household and includes a ward or foster child.[18]
The person named on the declarations page was Edinger, and the policy did not further define "family." The applicable UIM limit was $25,000.
On August 21, 1994, Blake was in an auto accident while riding as the passenger of an uninsured driver. His injuries included brain damage.
On November 19, 1997, Blake sued to establish that he was an "insured under the terms of [Ray's] policy for purposes of the uninsured motorist coverage provided[.]"[19] On December 24, 1998, Penn-America moved for summary judgment. Penn-America argued that Blake was not an insured because he "was neither (1) a member of [Ray's] family[ ] nor (2) a resident in [Ray's] household."[20] On January 22, 1999, the trial court "reluctantly" granted Penn-America's motion.[21] A final order was entered, and this appeal followed.
The parties raise two questions on appeal. One is whether Blake was a "member of the family" within the meaning of the policy language quoted above. The other is whether Blake was "a resident of the household" within the meaning of the policy language quoted above. Blake is covered if we answer both questions yes. Blake is not covered if we answer either question no.

I.
Before addressing these questions, we must understand the rules that apply when addressing them. A court must interpret a word in an insurance policy as the average purchaser of insurance would have understood it when the policy was purchased.[22] If the average purchaser would have understood it to have only one reasonable meaning, the court must give the word that meaning.[23] If the average purchaser would have understood the word to have two or more reasonable meanings, the word is ambiguous,[24] and the court must give it the reasonable meaning most favorable to coverage.[25]
When deciding how an average purchaser of insurance would have understood such a word, the court must consider not just the word itself, but also the context within which the word was used.[26] As the Supreme Court has noted, "A word is not a crystal, transparent and unchanged; it is the skin of a living thought and may vary greatly in color and content according to the circumstances and the time in which it is used."[27]
*461 Context includes a number of components in addition to the word itself. One is the remainder of the contract in which the word appears. The contract must be read as a whole,[28] and doing that sometimes sheds light on the meaning the parties wanted the word to have.
Another component is the parties' dealings and negotiations, if any, provided that such dealings and negotiations do not contradict the parties' final written agreement and were objectively manifested.[29] In a consumer case like this, of course, "it is unusual for the terms of the policy to be negotiated."[30]
A third component, often overlooked, is the time and place at which the word was used. Different societies can give the same word different meanings,[31] and even the same society can give the same word different meanings at different times.[32] Accordingly, one cannot interpret the meaning of a word without taking into account when and where the word was used.
A fourth component is the meaning or meanings that society attributed to the word at the place and time of its use. The average purchaser of insurance is a member of society; members of society generally understand a word to have its societal meaning or meanings, absent contrary manifestations; and thus an average purchaser of insurance generally understands a word to have its societal meaning or meanings. For exactly this reason, courts often state that the undefined terms of an insurance policy should be given their plain, ordinary and popular meaning.[33]
The Supreme Court recently expressed these rules in Kitsap County v. Allstate Insurance Company.[34] It said:
The court examines the terms of an insurance contract to determine whether under the plain meaning of the contract there is coverage. Boeing Co. v. Aetna Cas. & Sur. Co., 113 Wash.2d 869, 876, 784 P.2d 507[ ] (1990). If terms are defined in a policy, then the term should be interpreted in accordance with that policy definition. Undefined terms, however, must be given their "plain, ordinary, and popular" meaning. Boeing, 113 Wash.2d at 877, [784 P.2d 507] (citations omitted). To determine the ordinary meaning of undefined terms, courts may look to standard English dictionaries. If words have both a legal, technical meaning and a plain, ordinary meaning, the ordinary meaning will prevail unless it is clear that both parties intended the legal, technical meaning to *462 apply. Boeing, 113 Wash.2d at 882, [784 P.2d 507].
If policy language is clear and unambiguous, a court may not modify the insurance contract or create an ambiguity. American Star, 121 Wash.2d at 874, [854 P.2d 622]. An ambiguity in an insurance policy is present if the language used is fairly susceptible to two different reasonable interpretations. American Star, 121 Wash.2d at 874, [854 P.2d 622]. If there is an ambiguity, extrinsic evidence, if any, of the parties' intent may normally be considered. Fraternal Order of Eagles, Aerie No. 649 v. General Accident Ins. Co., 58 Wash.App. 243, 245, 792 P.2d 178, review denied, 115 Wash.2d 1018, 802 P.2d 127 (1990); Greer v. Northwestern Nat'l Ins. Co., 109 Wash.2d 191, 200, 743 P.2d 1244 (1987). If a policy remains ambiguous even after resort to extrinsic evidence, then the ambiguity is construed against the insurer. American Star, 121 Wash.2d at 874-75, [854 P.2d 622].[35]
In this case, the relevant time and place are the time and place at which Ray purchased his policy of insurance (i.e., August 1994 in Washington). He and Penn-America did not engage in relevant dealings or negotiations, as is normal when a consumer purchases a standard policy of insurance. Thus, we should ascertain whether the policy defined the disputed terms and, if not, how the average purchaser of insurance would have understood them.

II.
The first question, as already noted, is whether Blake was a "member of the family." The parties do not dispute the meaning of the word "member," but they do dispute the meaning of the word "family." Penn-America argues that "family" means only persons related by blood or law; that Blake and Ray were not related by blood or law; and thus that Blake and Ray were not members of the same family. Blake argues that "family" is a matter of relationships; that he, Sue, and Ray related to each other as "family"; and thus that he and Ray were members of the same family.
Under the rules set forth above, we should look first to Penn-America's policy. When we do that, however, we find that the policy does not manifest or adopt any particular meaning of the word "family." It simply uses the word without defining it.
Hoping to fill this void with an implied definition, the lead opinion asserts that an average purchaser of insurance would necessarily infer, from the fact that the policy includes "spouse," "ward," and "foster child" as family members, the additional fact that the policy excludes as family members all persons unrelated by blood or law. I strongly disagree for several reasons. (1) The average purchaser of insurance would not think of, much less adopt, such an abstruse inference. (2) Assuming without conceding that an average purchaser could reasonably read references to "spouse," "ward," and "foster child" as both inclusionary and exclusionary, he or she could just as reasonably read such references as inclusionary only.[36] The latter reading most favors coverage, and under the law it is the one this court must adopt.[37] (3) An average purchaser reasonably reading such references as inclusionary only would reasonably believe the policy extended to Blake, for his relationship to Ray was at least as familial as a relationship between Ray and ward or foster child. (4) And finally, an average purchaser of insurance would not dream that Ray's adult brother-in-law or sister-in-law *463 would be covered if resident in the home, but that Blake would not be covered if resident in the home; yet that is precisely the view the lead opinion espouses when it says that "spouse," "ward" and "foster child" mean "traditional blood relations, extended to include those whose family ties are created by operation of law."[38]
Because Penn-America's policy does not define the word "family," we should ascertain its ordinary meaning or meaningsi.e., the meanings that an average purchaser would ascribe to itby "look[ing] to standard English language dictionaries,"[39] and by looking to other authoritative writings and orations (for that is what the dictionary writers themselves do when authoring their definitions).[40] Here then, I turn to (1) standard dictionaries; (2) judicial writings from the Supreme Court of Washington; and (3) an anthropological text. All were published before, or within 5 years after, the relevant time of early August 1994.
In early August 1994, standard dictionaries indicated that the word "family" had a number of meanings. One meaning was a group whose members are related by blood.[41] Another meaning was a group whose members are related by blood or law.[42] A third meaning was a group whose members maintain family relationships.[43] A fourth meaning was a group whose members reside together under the same roof.[44] Other meanings may have existed also.
*464 Parenthetically, I hasten to agree with the lead opinion that the fourth of these meanings is impliedly eliminated by Penn-America's policy. To define "family" as a group that resides together would conflate the policy's requirements that an insured be both a family member and a household resident, and to conflate two requirements is not a reasonable way to read the policy as a whole.[45] The problem, however, is that more than one reasonable meaning remains.
Just as standard dictionaries reflected several meanings in early August 1994, judicial writings did also. In July 1993, just over a year before the date in issue here, the Washington Supreme Court stated that definitions of the word "family" "range from limiting the "family" to the historical, traditional persons related by blood, marriage, or adoption" to "a group of people who live, sleep, cook, and eat upon the premises as a single housekeeping unit."[46] The court explained:
On the one hand, in today's society most people ... probably would conclude that for this purpose, "family" means something more than only persons related by blood, marriage or adoption. On the other hand, in this context, it is likely most people would reject the notion that "family" includes any group of people who happen to share a common roof and table. Some reflection leads us to attribute certain characteristics to a concept of "family", even in the extended sense. These include: (1) a sharing of responsibilities among the members, a mutual caring whether physical or emotional, (2) some commonality whether it be friendship, shared employment, mutual social or political interest, (3) some degree of existing or contemplated permanency to the relationship, and (4) a recognition of some common purpose, persons brought together by reasons other than a referral by a state agency.[47]
Moreover, the Washington Supreme Court recognized, as early as 1935,[48] that the word "family," if not otherwise defined or restricted, is not limited to persons related by blood or law. The court said:
The word "household" is defined by the dictionaries and the courts as the members of a house collectively; a domestic establishment, including servants and attendants. The word has been considered as synonymous with the word "family." The word "family" is defined by Webster to be: "The body of persons who live in one house, and under one head or manager." While in a restricted sense the word "family" may be used interchangeably with "household," there is a difference in the ideas suggested by the two words. The word "family" conveys the notion of some relationshipblood or otherwise. In its most common use, the word implies father, mother and childrenimmediate blood relatives; but the word is also used to designate many other and extended relationships.[49]
*465 In early August 1994, anthropological texts were in accord with the noted dictionaries and judicial writings. As early as 1960 one author stated:
The family is a social group characterized by common residence, economic cooperation, and reproduction. It includes adults of both sexes, at least two of whom maintain a socially approved sexual relationship, and one or more children, own or adopted, of the sexually cohabiting adults. The family is to be distinguished from marriage, which is a complex of customs centering upon the relationship between a sexually associating pair of adults within the family. Marriage defines the manner of establishing and terminating such a relationship, the normative behavior and reciprocal obligations within it, and the locally accepted restrictions upon its personnel.

Used alone, the term "family" is ambiguous. The layman and even the social scientist often apply it undiscriminatingly to several social groups which, despite functional similarities, exhibit important points of difference. These must be laid bare by analysis before the term can be used in rigorous scientific discourse.[50]
In sum, the average purchaser of insurance in August 1994 would reasonably have understood, based on society's use of the word in dictionaries, judicial writings, and other authorities, that the word "family" had several reasonable meanings; that one such meaning was a stable social group whose members maintain family relationships; and that Ray, Sue, and Blake were such a group. The average purchaser of insurance in August 1994 would reasonably have understood that Penn-America's policy eliminated a meaning of the word "family" based solely on residency, but he or she would not have understood that Penn America's policy adopted nor eliminated, expressly or impliedly, any other meaning of the word "family." The reasonable meaning that most favors coverage is the one argued by Blake, the law obligates us to adopt it, and we err by not doing so.
I offer some additional criticisms of the other opinions before closing this portion of my discussion. The lead opinion asserts (1) that the "most common" use of "family" is "immediate blood relatives" such as "father, mother and children," and (2) that "the most common use is, by definition, the meaning an average insurance purchaser is most likely to consider."[51] Our task, however, is not to ascertain or adopt the most common meaning of "family" (although that is one factor to be considered). Our task, rather, is to ascertain each meaning that an average purchaser of insurance would reasonably have understood, then adopt the meaning that most favors coverage. By substituting the reasonable meaning that is "most common" for the reasonable meaning that most favors coverage, the lead opinion misses the issue or declines to follow the law.[52]
Both the lead opinion and the concurrence misuse the idea of context. The average-purchaser test, by its very terms, requires us to look beyond the insurance industry, and to read a policy as those not in the insurance industry (i.e., as the average purchaser in general society) would read it. Yet the lead opinion and the concurrence attempt to construct and then rely on a narrower "insurance context." This directly contravenes, among other things, the Supreme Court's recent statement in Kitsap County v. Allstate Insurance Company: "If words have both a legal, technical meaning and a plain, ordinary meaning, the ordinary meaning will prevail unless it is clear that both parties intended the legal, technical meaning to apply."[53]
The lead opinion is internally inconsistent. In the third paragraph of its analysis section, *466 it correctly acknowledges that when words in a policy are not defined, courts should look to standard dictionaries. Then, in the ninth, tenth and eleventh paragraphs, it asserts that this dissent should not look to standard dictionaries.
The concurrence rules by ipse dixit, except for its improper reliance on an "insurance context." It does no more than assert, without an articulated basis and contrary to all the foregoing authorities, that the word "family" is unambiguous.
The concurrence also states that the dissent is advocating a very broad definition of "member of the family." The response, of course, is that the dissent is not advocating any definition at all; it is simply attempting to read the policy as Penn America wrote it and as an average purchaser would understand.
In the end, the concurrence and the lead opinion merely assert or imply that if we give effect to the reasonable meaning of "family" that most favors coverage, we will be implementing a definition of "family" that is too broad to be workable. The answer, of course, lies with Penn-America. It may define "family" as narrowly as it wants[54] provided it does so before the policy is sold. After the policy is sold, "[i]t is the duty of the court to declare the meaning of what is written."[55]

III.
Having concluded that Blake was "a member of the family," we should turn next to whether he was also "a resident of the household." Division One has said:
The phrase "residents of the same household" has no fixed meaning but varies according to the circumstances of the case. American Universal Ins. Co. v. Thompson, 62 Wash.2d 595, 599, 384 P.2d 367 (1963) (applying California law); Cal-Farm Ins. Co. v. Boisseranc, 151 Cal. App.2d 775, 312 P.2d 401 (1957). In general terms, dictionaries define "resident" as one who dwells or has an abode in a place for a continued length of time and "household" as those who dwell under the same roof to compose a family living together. See Consumers United Ins. Co. v. Johnson, 26 Wash.App. 795, 801, 614 P.2d 657 (1980) (using dictionary definitions to construe a driver limitation endorsement). A person does not, however, have to remain physically within the household. As long as the person has some regular, permanent attachment to the family household, most courts find that person remains part of the household. Consequently, children away at school in temporary residences with the intention of returning to the family household remain residents of the parental household. See, e.g., Crossett v. St. Louis Fire & Marine Ins. Co., 289 Ala. 598, 269 So.2d 869 (1972); American States Ins. Co. v. Walker, 26 Utah 2d 161, 486 P.2d 1042 (1971). Children in military service who have not acquired a separate domicile also remain residents of the parental household. See, e.g., American Universal Ins. Co. v. Thompson, supra; Handal v. American Farmers Mut. Cas. Co., 79 Wis.2d 67, 255 N.W.2d 903 (1977) (applying Iowa law). But see Compton v. Sims, 96 Idaho 762, 536 P.2d 1112 (1975). Spouses remain residents of the same household even though one spouse has left the family residence if the departing spouse had the intention of returning or retained the hope of effecting a reconciliation. See, e.g., Hawaiian Ins. & Guar. Co. v. Federated Am. Ins. Co., [13 Wash.App. 7, 534 P.2d 48 (1975)] supra; Lumbermens Mut. Cas. Co. v. Continental Cas. Co., 387 P.2d 104 (Alaska 1963); Holloway v. Farmers Ins. Exch., 252 Ark. 899-C, 481 S.W.2d 328 (1972); See also Neidhoefer v. Automobile Ins. Co., 182 F.2d 269, 273 (7th Cir.1950) (intent of the departing family member important, and perhaps controlling, factor).[56]
*467 It is undisputed here that Blake lived in Sue and Ray's household from 1989 through the date of the accident, except from December 1993 to perhaps May 1994. It is undisputed here that Blake lived in their household for the three or four months immediately preceding his accident. It follows that he was "a resident of the household" on the date of his accident.

IV.
I finish where I started. Although Penn-America had every right to limit "family" to persons related by blood or law,[57] this court does not. This court is obligated to identify each reasonable meaning of "family" that the average purchaser of insurance would understand, and to adopt that meaning most favorable to coverage. In August 1994, the average purchaser would not have understood "family" to mean only persons related by blood or law; on the contrary, he or she would have understood "family" to include a group like Ray, Sue, and Blake, whose members maintain close familial relationships. The latter understanding is the one most favorable to coverage, and the one we are obligated to adopt here. Therefore, I respectfully dissent.[58]
NOTES
[1] Matthews does not remember anything that happened six months before or after the accident, but both his mother and Edinger declare that three or four months before the accident Matthews was staying with them again.
[2] BLACK'S LAW DICTIONARY 620 (7th ed.1999).
[3] Mains Farm Homeowners Ass'n v. Worthington, 121 Wash.2d 810, 817, 854 P.2d 1072 (1993).
[4] The cases, other than Mains, cited by the dissent for a broad definition are meretricious relationship cases, not insurance coverage cases.
[5] Ray Edinger purchased this six-month policy in 1994.
[6] Webster's defines anthropology as "the study considering man's physical character, historical and present geographical distribution, racial classification, group relationships, and cultural history."
[7] This assumes no statutory or regulatory prohibition.
[8] I will use the first names of Sue and Blake because they have the same last name. I will use Ray's first name in order to be consistent.
[9] Huff v. Budbill, 141 Wash.2d 1, 7, 1 P.3d 1138 (2000); Young v. Key Pharm., Inc., 112 Wash.2d 216, 226, 770 P.2d 182 (1989). The record consists mainly of three declarations and two examinations under oath. The declarations were made by Sue, Blake, and Ray. The examinations under oath were of Blake and Ray. Penn-America submitted the insurance policy and some other documents, none of which significantly contravenes the declarations or examinations under oath.
[10] Clerk's Papers at 76.
[11] The lead opinion mentions that Blake and his girlfriend had a child together. That is true, but Blake's relationship with both mother and child seems to have been sporadic.
[12] Clerk's Papers at 19-20.
[13] Clerk's Papers at 16-18. Relying on Marshall v. AC & S, Inc., 56 Wash.App. 181, 185, 782 P.2d 1107 (1989), see also Schonauer v. DCR Entertainment, Inc., 79 Wash.App. 808, 817-18, 905 P.2d 392 (1995), review denied, 129 Wash.2d 1014, 917 P.2d 575 (1996), Penn-America claims that Ray's and Blake's affidavits are inconsistent with their examinations under oath, and thus that the affidavits may not be used. In my view, the affidavits and examinations are consistent with respect to the facts set forth in the text.
[14] Clerk's Papers at 14-15.
[15] Clerk's Papers at 72.
[16] Clerk's Papers at 71-72. The record fails to show whether Blake paid "rent" regularly or sporadically.
[17] Clerk's Papers at 37 (emphasis added).
[18] Clerk's Papers at 30.
[19] Clerk's Papers at 1.
[20] Clerk's Papers at 4.
[21] Report of Proceedings at 3.
[22] Kent Farms, Inc. v. Zurich Ins. Co., 140 Wash.2d 396, 399, 998 P.2d 292 (2000); Allstate Ins. Co. v. Peasley, 131 Wash.2d 420, 424, 932 P.2d 1244 (1997); Queen City Farms, Inc. v. Cent. Nat. Ins. Co. of Omaha, 126 Wash.2d 50, 65, 882 P.2d 703 (1994); McDonald Indus., Inc. v. Rollins Leasing Corp., 95 Wash.2d 909, 913, 631 P.2d 947 (1981); Witherspoon v. St. Paul Fire & Marine Ins. Co., 86 Wash.2d 641, 650, 548 P.2d 302 (1976).
[23] Peasley, 131 Wash.2d at 424, 932 P.2d 1244; Kish v. Ins. Co. of N. Am., 125 Wash.2d 164, 170, 883 P.2d 308 (1994); Washington Pub. Util. Dists.' Utils. Sys. v. Public Utility District No. 1, 112 Wash.2d 1, 10-11, 771 P.2d 701 (1989).
[24] Kitsap County v. Allstate Ins. Co., 136 Wash.2d 567, 576, 964 P.2d 1173 (1998); American Star Ins. Co. v. Grice, 121 Wash.2d 869, 874, 854 P.2d 622, 865 P.2d 507 (1993).
[25] Peasley, 131 Wash.2d at 424, 932 P.2d 1244; Kish, 125 Wash.2d at 170-71, 883 P.2d 308; Washington Pub. Util. Dists. Utils. Sys., 112 Wash.2d at 11, 771 P.2d 701; McDonald Indus., Inc., 95 Wash.2d at 913, 631 P.2d 947.
[26] Lynott v. Nat. Union Fire Ins. Co., 123 Wash.2d 678, 683-84, 871 P.2d 146 (1994); Kitsap County, 136 Wash.2d at 576, 964 P.2d 1173; U.S. Life Credit Life Ins. Co. v. Williams, 129 Wash.2d 565, 569, 919 P.2d 594 (1996).
[27] Berg v. Hudesman, 115 Wash.2d 657, 664, 801 P.2d 222 (1990) (quoting Towne v. Eisner, 245 U.S. 418, 38 S.Ct. 158, 62 L.Ed. 372 (1918)); U.S. Life Credit Life Ins., 129 Wash.2d at 569, 919 P.2d 594.
[28] Tyrrell v. Farmers Ins. Co., 140 Wash.2d 129, 133, 994 P.2d 833 (2000) ("In reviewing the policy, it is considered as a whole so as to give effect to every clause in it."); Kitsap County, 136 Wash.2d at 575, 964 P.2d 1173 ("A policy is considered as a whole so that the court can give effect to every clause in the policy."); Peasley, 131 Wash.2d at 424, 932 P.2d 1244 ("The insurance contract must be viewed in its entirety; a phrase cannot be interpreted in isolation."); American Star Ins. Co., 121 Wash.2d at 877, 854 P.2d 622 ("[A]n insurance policy must be considered as a whole with the court giving effect to each clause in it.").
[29] Lynott, 123 Wash.2d at 683-84, 871 P.2d 146; Washington Pub. Util. Dists.' Utils. Sys., 112 Wash.2d at 11, 771 P.2d 701; Dwelley v. Chesterfield, 88 Wash.2d 331, 335, 560 P.2d 353 (1977); see also Kitsap County, 136 Wash.2d at 576, 964 P.2d 1173.
[30] Lynott, 123 Wash.2d at 683, 871 P.2d 146.
[31] The word "pie" provides an example. In a Spanish-speaking country, it often means "foot" or "leg." THE UNIVERSITY OF CHICAGO SPANISH ENGLISH DICTIONARY 162 (1967). In an English-speaking country, it does not have that meaning, but it can mean food comprised of crust and a filling. WEBSTER'S II NEW COLLEGE DICTIONARY 833 (1999).

The word "lift" provides another example. In England, it often means an elevator. In the United States, it rarely has that meaning, but it often has other meanings. See WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1307 (1969).
[32] The word "mouse" provides an example. One hundred years ago, it meant a small rodent. Today, it can mean a small rodent or a point-and-click device used to operate a computer.
[33] N. Pac. Ins. Co. v. Christensen, 143 Wash.2d 43, 48, 17 P.3d 596 (2001); Kitsap County, 136 Wash.2d at 576, 964 P.2d 1173; Boeing Co. v. Aetna Cas. & Sur. Co., 113 Wash.2d 869, 876, 784 P.2d 507 (1990).
[34] Kitsap County, 136 Wash.2d 567, 964 P.2d 1173.
[35] Kitsap County, 136 Wash.2d at 576, 964 P.2d 1173.
[36] In other words, an average purchaser could read the references to spouse, ward, and foster child as designed to assure coverage to those people, but not as designed to deny coverage to others.
[37] I confess not to understand the lead opinion's assertion that the references to spouse, ward, and foster child would be "meaningless and unnecessary" unless they are read as having both exclusionary and inclusionary effects. Without those references, there would be doubt about coverage for the spouse, ward, or foster child who was not listed on the declarations page as a named insured. With those references, there is assurance that such persons are covered-even if the references are read as inclusionary only. The references have meaning even when not read as exclusionary.
[38] Lead opinion at 455.
[39] N. Pac. Ins. Co., 143 Wash.2d at 48, 17 P.3d 596; Tyrrell, 140 Wash.2d at 133, 994 P.2d 833; Kitsap County, 136 Wn.2d at 576, 964 P.2d 1173.
[40] See 9 ENCYCLOPEDIA AMERICANA (International ed.2000), at 85-86; Preface to BLACK'S LAW DICTIONARY (7th ed.1999), at x.
[41] "[A] group of persons of common ancestry[.]" WEBSTER'S NEW AMERICAN DICTIONARY 187 (1995); WEBSTER'S NEW WORLD DICTIONARY 505 (2d college ed.1970); "[A]ll those claiming descent from a common ancestor[.]" WEBSTER'S NEW WORLD DICTIONARY 505 (2d college ed.1970); "[A] group of blood-relatives; all the relations who descended from a common ancestor, or who spring from a common root[.]" WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 821 (1966); "[T]he children of the same parents[.]" BLACK'S LAW DICTIONARY 727 (4th ed.1968) (citing Civil Code La. Art 3556, no 12); "[A] group of kindred persons[.]" BLACK'S LAW DICTIONARY 727 (4th ed.1968) (citing Hartley v. Bohrer, 52 Idaho 72, 11 P.2d 616, 618 (1932)); "In secondary meaning, "family" means those who are of the same lineage, or descend from one common progenitor[.]" BLACK'S LAW DICTIONARY 727 (4th ed.1968) (citing Fratellanza Italiana v. Nugnes, 114 N.J.Eq. 185, 168 A. 589, 590 (1933)).
[42] "[A] group of persons connected by blood, by affinity, or by law[.]" BLACK'S LAW DICTIONARY 620 (7th ed.1999); "[A] group of people related by ancestry or marriage[.]" WEBSTER'S NEW WORLD DICTIONARY 505 (2d college ed.1970); "[H]usband and wife and their children[.]" BLACK'S LAW DICTIONARY 727 (4th ed.1968) (citing Franklin Fire Ins. Co. v. Shadid, Tex. Com.App. 68 S.W.2d 1030, 1032 (1934)).
[43] "A group of persons, [usually] relatives, who live together[.]" BLACK'S LAW DICTIONARY 620 (7th ed.1999); "[A] group consisting of parents and their children[.]" BLACK'S LAW DICTIONARY 620 (7th ed.1999); "[A] social unit [usually] consisting of one or two parents and their children[.]" WEBSTER'S NEW AMERICAN DICTIONARY 187 (1995); "[A] social unit consisting of parents and the children that they rear[.]" WEBSTER'S NEW WORLD DICTIONARY 505 (2d college ed.1970); "[T]hose whom it is the natural or moral duty of one to support, or who are dependent on him for support." BLACK'S LAW DICTIONARY 727 (4th ed.1968) (citing Finn v. Eminent Household of Columbia Woodmen, 163 Ky. 187, 173 S.W. 349, 350 (1915)); "The word is used to designate many relationships." BLACK'S LAW DICTIONARY 727 (4th ed.1968) (citing Collins v. Northwest Cas. Co., 180 Wash. 347, 39 P.2d 986 (1935)); "[T]he basic biosocial unit in society having as its nucleus two or more adults living together and cooperating in the care and rearing of their own or adopted children[.]" WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 821 (1966).
[44] "[A] group of individuals living under one 0roof and under one head[.]" WEBSTER'S NEW AMERICAN DICTIONARY 187 (1995); "[A]ll the people living in the same house[.]" WEBSTER'S NEW WORLD DICTIONARY 505 (1970); "[A] collective body of any two persons living together in one house as their common home for the time[.]" BLACK'S LAW DICTIONARY 727 (4th ed.1968) (citing In re Barnes' Estate, 149 Misc. 149, 267 N.Y.S. 634 (1933)); "[A] collective body of persons, living together in one home, in a permanent and domestic character, under one head or management[.]" BLACK'S LAW DICTIONARY 727 (4th ed.1968) (citing State ex rel. Kemp v. Arnold, 234 Mo.App. 154, 113 S.W.2d 143, 146 (1938)); "[A] collective body of persons who live in one house and under one head or management[.]" BLACK'S LAW DICTIONARY 727 (4th ed.1968) (citing Fratellanza Italiana, 168 A. at 590); "In restricted sense, the word "family" may be used interchangeably with household[.]" BLACK'S LAW DICTIONARY 727 (4th ed.1968) (citing Collins, 180 Wash. 347, 39 P.2d 986); "[A] group of persons in the service of an individual[.]" WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 821 (1966); "[A] group of individuals living under one roof[.]" WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 821 (1966); "[T]he body of persons who live in one house ... including ... lodgers or boarders[.]" WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 821 (1966); "[A] group of persons sharing a common dwelling and table considered for census purposes to include at one extreme a single person living alone and at the other the residents of a hotel or the inmates of a prison." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 821 (1966).
[45] The requirement of residency is, of course, an important limiter. Without it, a family member (such as a child over the age of majority) would be entitled to coverage even after he or she has established his or her own home.
[46] Mains Farm Homeowners Ass'n v. Worthington, 121 Wash.2d 810, 817, 854 P.2d 1072 (1993).
[47] Mains Farm Homeowners Ass'n, 121 Wash.2d at 817-18, 854 P.2d 1072.
[48] Neither party contends, nor could it contend, that the meaning of the word "family" has narrowed over the years. If anything, it has broadened.
[49] Collins, 180 Wash. at 352, 39 P.2d 986, (emphasis added). See also, Cont'l Cas. Co. v. Weaver, 48 Wash.App. 607, 611, 739 P.2d 1192 (1987) (recognizing that "family" has various meanings).
[50] GEORGE PETER MURDOCK, SOCIAL STRUCTURE 1 (1960) (emphasis added).
[51] Lead at 4-5 (analysis section, fourth paragraph).
[52] Nor is the lead opinion aided by Weaver, 48 Wash.App. 607, 739 P.2d 1192, which construed the term "immediate family." In this case, we are construing the unmodified term "family." Because "family" has more reasonable meanings than "immediate family," Weaver is of no help here.
[53] Kitsap County, 136 Wash.2d at 576, 964 P.2d 1173.
[54] This assumes no statutory or regulatory restriction. No such restriction has been shown or considered here.
[55] Lynott, 123 Wash.2d at 683-84, 871 P.2d 146 (quoting Berg, 115 Wash.2d at 669, 801 P.2d 222).
[56] Pierce v. Aetna Cas. & Sur. Co., 29 Wash.App. 32, 36-37, 627 P.2d 152 (1981). See also David B. Harrison, Annotation, Who is "Resident" or "Member" of Same "Household" or "Family" as Named Insured, Within Liability Insurance Provision Defining Additional Insureds, 93 A.L.R.3d 420, 1979 WL 52271 (1979) (liability insurance); David B. Harrison, Annotation, Who is "Member" or "Resident" of Same "Family" or "Household," Within No Fault or Uninsured Motorist Provisions of Motor Vehicle Insurance Policy, 96 A.L.R.3d 804, 1980 WL 130891 (1979) (no-fault and uninsured motorist provision), superseded by 66 A.L.R.5th 269, 1999 WL 149788.
[57] This assumes no statutory or regulatory prohibition.
[58] I do not overlook, but I do reject, Penn-America's argument that Blake forfeited coverage by lying at his examination under oath. Given that he corrected the lie moments after making it, it will not support a forfeiture of coverage. If the case ever goes to trial, he can be impeached, in the discretion of the trial court, pursuant to ER 608(b).