617 S.E.2d 760

**GLEN FALLS INSURANCE COMPANY,**
Appellee and Plaintiff Below,

v.

**Billie Joe SMITH, Robin Smith and Johnny Combs, Appellants and Defendants Below.**

**GMAC Insurance Company, Appellee and Plaintiff Below,**

v.

**Johnny Combs, Appellant and Defendant Below.**

No. 31972.

Supreme Court of Appeals of West Virginia.

Submitted: Feb. 23, 2005.

Filed: July 1, 2005.

Charles B. Mullins, II, Pineville, for Appellants.

Rochelle L. Brightwell, Pietragallo, Bosick & Gordon, Weirton, for Glen Falls Insurance Company.

Robert P. Martin, Phillip C. Monroe, Campbell, Woods, Bagley, Emerson, McNeer & Herndon, P.L.L.C., Charleston, for GMAC Insurance Company.

Justice BENJAMIN delivered the opinion of the Court.

Justice DAVIS concurs and reserves the right to file a separate opinion.

Chief Justice ALBRIGHT dissents in part, concurs in part, and reserves the right to file a separate opinion.

Justice STARCHER dissents in part, concurs in part, and reserves the right to file a separate opinion.

BENJAMIN, Justice.

These consolidated actions are before the Court upon the appeal of the Appellant, Johnny Combs, defendant below, from the December 18, 2003 order of the Circuit Court of Wyoming County in Civil Action No. 02–C–257,[1] and in Civil Action No. 03–C–27.[2]

1. Billie Joe Smith and Robin Smith were also defendants below; however, they did not join Johnny Combs in the Petition for Appeal of the Circuit Court's Order and have not appeared as Appellants before this Court.

2. The two civil actions were consolidated by the

By its December 18, 2003 order, the Circuit Court granted both the motion of the Appellee, Glen Falls Insurance Company ("Glen Falls"), plaintiff below, for summary judgment in Civil Action No. 02–C–257 ("the Glen Falls case"), and the motion of the Appellee, GMAC Insurance Company ("GMAC"), plaintiff below, for summary judgment in Civil Action No. 03–C–27 ("the GMAC case").

In the Glen Falls case, Combs contends that the circuit court erred in determining as a matter of law that he was neither a "ward" nor a "foster child" of Billie Joe Smith, the named insured in a policy of automobile insurance issued by Glen Falls. Because of such determination, Combs was not eligible, according to the terms of the policy, for its underinsured motorist coverage for his injuries arising out of a single vehicle accident that occurred on January 29, 2002, involving a truck operated by Jimmy Dale Graham, in which Combs was a guest passenger.

In the GMAC case, Combs contends that the circuit court erred in determining as a matter of law that he was not, on January 29, 2002, a resident of the household of his biological mother, Leneice Combs, the named insured in an automobile insurance policy issued by GMAC. Because of such determination, Combs was not eligible, according to the terms of the policy, for its underinsured motorist coverage for his injuries arising out of the same January 29, 2002 automobile accident. Thus, Combs seeks coverage under the underinsured motorist coverage in both the GMAC and Glen Falls automobile insurance policies for alleged injuries in excess of the insurance policy limits paid by Jimmy Dale Graham's insurer.

Appellees, Glen Falls and GMAC, contend that the circuit court did not err in granting both of them summary judgment in their respective actions, Case Nos. 02–C–257 and 03–C–27. The Court has before it the petition for appeal filed by Johnny Combs, the briefs of the parties, and has heard oral

argument from counsel for the Appellant and Appellees. We conclude that the Circuit Court of Wyoming County did not err in granting Glen Falls' motion for summary judgment in Case No. 02–C–257 and did not err in granting GMAC's motion for summary judgment in Case No. 03–C–27. We therefore affirm the December 18, 2003 order.

## I.

### FACTS AND PROCEDURAL BACKGROUND

On January 29, 2002, the Appellant, Johnny Combs, was injured in a single vehicle accident while riding as a guest passenger in a truck operated by Jimmy Graham.[3] Combs sustained various physical injuries in this accident, including permanent facial scarring and the loss of several teeth, and incurred approximately $18,928.47 in medical expenses. He settled with Mr. Graham's liability carrier for the $20,000 policy limits of its coverage. Additionally, he asserted underinsured motorist claims against GMAC and Glen Falls contending (1) that he was a resident of the household of his mother, Leneice Combs, at the time of the January 29, 2002 accident and, therefore, qualified for underinsured motorist coverage for his injuries under a policy of insurance issued by GMAC to his mother, the named insured; and (2) that he was also a "ward" or "foster child" of Billie Joe Smith and a resident of Mr. Smith's household (which was separate from that of his mother's household) and was actually residing therein at the time of the accident, thus also qualifying for underinsured motorist coverage under a policy of insurance issued by Glen Falls to Billie Joe Smith, the named insured.

#### A. The GMAC Policy

By its terms, Leneice Combs' GMAC policy required Appellant Combs to have been "a resident of [her] household" at the time of

Circuit Court of Wyoming County in an agreed order entered on or about April 22, 2003.

**3.** Appellant Combs was actually involved in two separate motor vehicle accidents: January 29, 2002 and April 26, 2002. In the later accident, Appellant was a passenger in a vehicle driven by Robin Smith who was insured under the same

Glen Falls policy. Appellant filed a claim against the driver of the other vehicle in the April 26, 2002 accident. That claim was settled by the other driver's insurer for less than policy limits. Accordingly, Appellant now has no claims against either GMAC or Glen Falls for the April 26, 2002 accident.

the accident in order to be included in its underinsured motorist coverage. Believing that Combs did not qualify as a resident of his mother's household, GMAC instituted a declaratory judgment action in the Circuit Court of Wyoming County seeking a declaration as to whether or not Appellant Combs qualified as an insured under Leneice Combs' insurance policy. Following the filing of a counter-claim by Appellant Combs, the filing of answers to both the original complaint and the counter-claim, and discovery, GMAC filed a motion for summary judgment, to which Appellant filed no response. The motion was granted by the court in an order entered on December 18, 2003, from which Combs appeals to this Court. In its order, the court found "that the facts presented do not support a finding that Johnny Combs was a resident of his mother's household."

### B. The Glen Falls Policy

At the time of the accident at issue, Combs was twenty-two years old and was living with Billie Joe Smith at his home in Lynco, West Virginia.[4] Billie Joe Smith was married to Leneice Combs, Appellant Combs' biological mother, from July 1967 until they divorced in July 1978. Thereafter, Leneice Combs married Clark Combs and Appellant was born of that marriage. Leneice and Clark Combs divorced in 1980, remarried and divorced again in 1983. After the second divorce, Leneice Combs and Billie Joe Smith reestablished their relationship, but did not re-marry.[5] Billie Joe Smith apparently provided emotional and financial support to Appellant Combs and held him out as a son. Although Appellant Combs refers to Mr. Smith as "dad," there is no evidence on the record before this Court and no argument has been made, that Billie Joe Smith is Comb's biological father. Further, no argument has been made nor evidence produced that Mr. Smith ever legally adopted Combs or formally accepted legal responsibility for him via guardianship papers or otherwise.

On or about January 29, 2002, Glen Falls issued an automobile insurance policy, having a policy period of January 22, 2002 through January 22, 2003, to Billie Joe Smith. Appellant Combs was not a named driver nor an additional insured under this policy. Nevertheless, Combs asserts a claim for underinsured motorist benefits under this policy for injuries sustained in the January 29, 2002 automobile accident arguing that Mr. Smith was his "father."

The Glen Falls policy defines "Covered Person" for the purposes of underinsured motorist coverage as:

> a. You for the ownership, maintenance or use of any vehicle, except for occupying, or when struck by, a vehicle owned by you which is not insured for this coverage under this policy;
>
> b. Any family member:
>
> (1) Who does not own an automobile for the maintenance or use of any vehicle;
>
> (2) Who owns an automobile but only for the use of an insured motor vehicle;
>
> Except while occupying or when struck by, a vehicle owned by you or that person which is not insured for this coverage under this policy.

(Emphasis in original). The term "family member" is defined as:

> 9. Family Member means a person related to you by blood, marriage or adoption who is a resident of your household. **This includes a ward or foster child.**
>
> For the purposes of this definition, to be considered a resident of your household when evaluating coverage for a loss a person must have been actually residing in your household on the date the loss occurred. However, your:
>
> a. Son;
>
> b. Daughter;
>
> c. Ward; or
>
> d. Foster child;

---

**4.** It appears from the record that Appellant Combs lived almost continuously with Billie Joe Smith from the time Appellant was eight or ten years old. Upon turning eighteen, Appellant lived outside of the State of West Virginia for some period of time in connection with his employment.

**5.** The record is not clear if Leneice Combs and Billie Joe Smith resided together upon resuming their relationship or, if so, when they ceased cohabitation.

In the United States military or away at school will be considered a resident of your household unless he or she has demonstrated an intent to reside elsewhere permanently.

On or about December 4, 2002, Glen Falls instituted a declaratory judgment action seeking a declaration that Combs' claim for underinsured motorists benefits was not covered under the terms of the policy issued to Billie Joe Smith. An amended complaint for declaratory relief was filed on or about April 9, 2003 seeking substantially the same relief. After discovery, Glen Falls filed a motion for summary judgment seeking a declaration that coverage did not exist under its policy because Appellant Combs was not a "family member" as defined by the policy terms. Following briefing by the parties, oral argument was held before the circuit court on October 3, 2003. By Order dated December 18, 2003, the circuit court granted Glen Falls' motion for summary judgment finding that Combs did not qualify as either a "ward" or "foster child" of Billie Joe Smith. The circuit court found "that the term 'ward' implies a guardian-ward relationship created by legal process, such as that described in W. Va. Code § 44A–1–2," and "that West Virginia law does not support a finding that Johnny Combs qualifies as Billie Joe Smith's foster child." Appellant Combs now appeals the circuit court's ruling to this Court.

## II.

### Standard of Review

■ This appeal arises from the entry of summary judgment in favor of two separate insurance companies finding that coverage does not exist for Appellant Combs' claims under the underinsured motorist provisions of either individual policy. We review a circuit court's order granting summary judgment de novo. Syl. Pt. 1, Painter v. Peavy, 192 W.Va. 189, 451 S.E.2d 755 (1994). In reviewing summary judgment, this Court will apply the same test that the circuit court should have used; namely, whether "it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law." Syl. Pt. 3, Aetna Casualty & Surety Co. v. Federal Ins. Co. of New York, 148 W.Va. 160, 133 S.E.2d 770 (1963). As with

the circuit court, we "must draw any permissible inference from the underlying facts in the light most favorable to the party opposing the motion," that is, in this case, the Appellant. Painter, 192 W.Va. at 192, 451 S.E.2d at 758.

■ Each ruling of the circuit court presents a question of the proper coverage under an insurance contract. We have previously recognized that the "[d]etermination of the proper coverage of an insurance contract when the facts are not in dispute is a question of law." Syl. Pt. 1, Tennant v. Smallwood, 211 W.Va. 703, 568 S.E.2d 10 (2002). Likewise, "[t]he interpretation of an insurance contract, including the question of whether the contract is ambiguous, is a legal determination that, like a lower court's grant of summary judgement, shall be reviewed de novo on appeal." Syl. Pt. 2, Riffe v. Home Finders Associates, Inc., 205 W.Va. 216, 517 S.E.2d 313 (1999).

## III.

### Discussion

#### A. The GMAC Case

■ In Syllabus Point 3 of Farmers Mutual Insurance Company v. Tucker, 213 W.Va. 16, 576 S.E.2d 261 (2002), this Court held:

in a homeowners' insurance policy that does not otherwise define the phrase "resident of your household," the phrase means a person who dwells—though not necessarily under a common roof—with other individuals who are named insureds in a manner and for a sufficient length of time so that they could be considered to be a family living together. The factors to be considered in determining whether that standard has been met include, but are not limited to, the intent of the parties, the formality of the relationship between the person in question and the other members of the named insureds' household, the permanence or transient nature of that person's residence therein, the absence or existence of another place of lodging for that person, and the age and self-sufficiency of that person.

The meaning of the phrase "resident of your household," if not otherwise defined, would be the same when used in an automobile policy as it is when used in a homeowners' liability policy. Thus, for Appellant Combs to have been a resident of Leneice Combs' household on the date of the accident (January 29, 2002) for which he sought underinsured motorist coverage under her GMAC insurance policy, he must, under the foregoing meaning of the phrase, have, prior to and on that date, dwelt with Leneice Combs in her household "for a sufficient length of time so that [the two of them] could be considered to be a family living together."

This Court in *Farmers Mutual* set forth five non-inclusive factors, quoted above, which are to be considered in determining whether Johnny Combs had met that standard. The circuit court considered these factors in its December 18, 2003, order and, in granting GMAC's motion for summary judgment, concluded:

> 17. In the instant case, the parties, Leneice and Johnny Combs, both indicated that they considered Johnny Combs primary residence to be with Billie Joe Smith; Johnny Combs was past the age of majority; he had no specific living quarters at his mother's residence; only a few of his belongings were stored at his mother's home and that was primarily for his convenience on those occasions when he spent the night; he regularly visited without staying overnight; he looked to Billie Joe Smith for money when he was unemployed; and, although he was a somewhat frequent overnight guest at his mother's home, his stays could best be described as transient and sporadic.

Before proceeding with a consideration of the *Farmers Mutual* factors in the GMAC case, it should be noted that in order for Combs to have qualified for underinsured motorist coverage under the Glen Falls insurance policy to Billie Joe Smith, he must, among other requirements, have also been "a resident of [Billie Joe Smith's] household" and have been "actually residing in [Billie Joe Smith's] household on the date the loss occurred" meaning, according to *Farmers Mutual*, that Combs had to have dwelt with Billie Joe Smith in his household "for a sufficient length of time so that [the two of them] could be considered to be a family living together" on the date the loss occurred.[6]

This first factor is obviously a most significant one. Did Combs intend that his dwelling be with his mother on January 29, 2002, and did she, in turn, intend that her dwelling be his so that they considered themselves to be a family living together? In *Farmers Mutual*, this court observed that "because a determination of residency depends on the intent of the parties, it is typically a question of fact that cannot be determined through a motion for summary judgment." *Farmers Mutual*, 213 W.Va. at 25, 576 S.E.2d at 270. While that may often be the typical case, it is not the case here because Combs and his mother made their mutual intent amply clear during testimony: On and preceding January 29, 2002, Combs "dwell[ed] with" (using the language found in *Farmers Mutual*) Billie Joe Smith, the man who raised him and with whom he, at the age of twenty-two, continued to reside on and prior to that date.[7] Smith testified that Combs lived at his home 20 to 25 days out of the month, and that the rest of the time Combs stayed with different people, including his brother, his sisters, his friends, and his mother. Smith also testified that at the time of the truck accident on January 29, 2002, he, his mother, and Combs were living together in the Smith home in Lynco, W. Va.

---

6. While Glen Falls challenged Comb's qualification for underinsured motorist coverage under its policy with Billie Joe Smith on the grounds that he was neither a "ward" nor a "foster child" of Smith, Glen Falls did not challenge Appellant's residency in Billie Joe Smiths' household.

7. Appellant Combs is neither the biological nor the adopted son of Billie Joe Smith. In his deposition, Combs referred to Billie Joe Smith as his "daddy." When asked why it was that Combs called Smith his "daddy", Smith replied in his deposition, "Well, he sort of adopted me." Smith further related that Combs commenced living with him when he was around eight or ten years of age and that the relationship had continued, at least until the date of Smith's deposition, March 25, 2003. Smith stated that the reason Combs started living with him at the age of eight or ten was because "[h]e just wanted to stay with me and I couldn't deny him the right." Smith was asked, "Do you consider [your home] to be his [Combs'] home?" Smith replied "Yes, sir."

Appellant Combs' testimony confirms his residence with Smith, not his mother, on and before January 29, 2002. About the Smith home, Combs was asked, "Is that basically where you considered your home to be?" He replied in the affirmative. Appellant further testified that he lived with Smith, not his mother, prior to the accident and only stayed with his mother occasionally.

In her deposition, Leneice Combs likewise related that she considered Appellant Combs to be living primarily with Billie Joe Smith, and that she considered Smith's home to be her son's home. She further testified that Appellant lived with Smith in January, 2002, and had done so for most of his life; that he had no set schedule for visiting her; that he visited her more often than he stayed overnight; and that, in her opinion, he had been living with Smith since he, Combs, had been eight or ten years old.

Based upon the definitive deposition responses, we find that there was no genuine issue as to Appellant Combs' and Leneice Combs' "intent" with respect to where Appellant "dwell[ed] on and prior" to the truck accident on January 29, 2002. They both believed that Appellant "dwell[ed] with" Billie Joe Smith, and was a resident of his household.

The remaining *Farmers Mutual* factors are undisputed and are likewise definitive that Appellant Combs did not reside with his mother. There was no formality to their relationship in Leneice Combs' residence. As Ms. Combs' testified, Appellant Combs "pops in and out." Thus, Appellant Combs' presence in Leneice Comb's residence was, at best, of a "transient nature." As previously considered, Appellant, his mother, Leneice Combs, and Billie Joe Smith all acknowledged that a place of lodging other than his mother's existed for Combs. All evidence of record conclusively confirms that it was Smith's residence where Combs had dwelled and made his home from the age of eight or ten until the date of their depositions. Finally, Combs was twenty-two years old at the time of the January 2002 truck accident. Combs was either self-sufficient or depended upon Billie Joe Smith for financial assistance from time to time. There was no evidence that Combs' mother provided him with any financial help.

In summary, it is clear from the foregoing that Appellant Combs "dwelled with" and "under the same roof" as Billie Joe Smith on and prior to the date of the truck accident on January 29, 2002, and that he was, therefore, a resident of Billie Joe Smith's household on and prior to that date, according to this Court's holdings in *Spangler v. Armstrong,* 201 W.Va. 643, 499 S.E.2d 865 (1997) (per curium) and *Farmers Mutual.* Based upon the evidence outlined above, the granting of summary judgment in favor of GMAC was appropriate in this case. We therefore affirm that order.

### B. The Glen Falls Policy

Appellant Combs also argues that the circuit court erred in holding that he did not qualify as either a "ward" or a "foster child" under the terms of the Glen Falls policy issued to Billie Joe Smith. Arguing that the terms are ambiguous, Combs claims underinsured motorist coverage should be provided. In support of this position, Combs argues that he always considered Billie Joe Smith to be his father and that Billie Joe Smith has always treated him as a son. Conversely, Glen Falls argues that both the term "ward" and the term "foster child" are terms which refer to legally recognized relationships and that the circuit court did not err in finding that Johnny Combs did not have a legally recognized relationship with Billie Joe Smith so as to qualify as a "family member" under the terms of the Glen Falls policy. For the reasons set forth below, we agree with the circuit court and Glen Falls.

We have long held that "[l]anguage in an insurance policy should be given its plain, ordinary meaning." Syl. Pt. 1, *Soliva v. Shand, Morahan & Co., Inc.,* 176 W.Va. 430, 345 S.E.2d 33 (1986), *overruled, in part, by National Mut. Ins. Co. v. McMahon & Sons, Inc.,* 177 W.Va. 734, 356 S.E.2d 488 (1987); Syl. Pt. 2, *Russell v. State Automobile Mutual Insurance Co.,* 188 W.Va. 81, 422 S.E.2d 803 (1992); Syl. pt. 2, *American States Ins. Co. v. Tanner,* 211 W.Va. 160, 563 S.E.2d 825 (2002). Moreover, "[w]here the provisions in an insurance policy contract are clear and unambiguous they are not subject to judicial construction or interpretation, but full effect will be given to the plain meaning

intended." Syl. Pt. 3, *Soliva, quoting,* Syl. Pt. 1, *Christopher v. United States Life Ins.,* 145 W.Va. 707, 116 S.E.2d 864 (1960). Where, however, the policy language under consideration is ambiguous, the policy should be liberally construed in favor of the insured "although such construction should not be unreasonably applied to contravene the object and plain intent of the parties." Syl. Pt. 6, *Hamric v. Doe,* 201 W.Va. 615, 499 S.E.2d 619 (1997), *quoting* Syl. Pt. 2, *Marson Coal Co. v. Insurance Co. of State of Pennsylvania,* 158 W.Va. 146, 210 S.E.2d 747 (1974). To be ambiguous, the policy provision must be *"reasonably susceptible* of two different meanings or [be] of *such doubtful meaning* that *reasonable minds might be uncertain or disagree as to its meaning."* Syl. Pt. 5, *Hamric, quoting Prete v. Merchants Property Ins. Co. of Indiana,* 159 W.Va. 508, 223 S.E.2d 441 (1976)(emphasis added). A contract of insurance should never be interpreted to create an absurd result, but should instead receive a reasonable interpretation. *Soliva,* 176 W.Va. at 432, 345 S.E.2d at 35. The standard is that of "what a reasonable person standing in the shoes of the insured would expect the language to mean." *Id.* at 433, at 35–36. It is the opinion of this Court that a twenty-two year old man, such as Appellant who has a history of adult gainful employment, cannot reasonably be considered a "ward" or "foster child" of another under the law of this State, particularly where there has never been a legally recognized relationship with the purported parent or guardian.

In order to qualify for underinsured motorist coverage under the Glen Falls policy, Johnny Combs must be both a "family member" of Billie Joe Smith and a "resident" of his household. The policy defines "family member" as "a person related to you by blood, marriage or adoption who is a resident of your household. This includes a ward or foster child." Because we find Johnny Combs is not a "family member" of Billie Joe Smith since he is not related to Billie Joe Smith by marriage or adoption and, furthermore, cannot be deemed a "ward" or "foster child" under West Virginia law, Combs' residence in Billie Joe Smith's household is, by itself, insufficient for Smith's coverage with Glen Falls to be extended to Combs.

 The operative policy language at issue in this appeal is the Glen Falls policy definition of "family member." Combs does not contend that he is related to Smith by blood, marriage or adoption. Instead, he contends that he qualifies as a "ward" or "foster child" under the policy definition. At least three courts have analyzed similar definitions and found that, due to the context in which they are used, the terms "ward" and "foster child" refer to relationships recognized by law. *See, Matthews v. Penn–America Ins. Co.,* 106 Wash.App. 745, 25 P.3d 451, 454 (2001)(finding specific references to spouse, ward or foster child strongly point to the traditional family definition—those connected by blood or law and holding policy only provides coverage for those related to the policy holder by blood, affinity or law) [8]; *Virginia Farm Bureau Mut. Ins. Co. v. Gile,* 259 Va. 164, 524 S.E.2d 642, 645 (2000)(holding term "foster child" as used in definition of the policy definition of "relative" unambiguously refers to a relationship recognized by law based upon context in which the term is used) [9]; *Pisani v. Travelers Ins. Co.,* 29 Mass.App.Ct. 964, 560 N.E.2d 155, 156

---

8. The policy at issue in *Matthews* provided underinsured motorist coverage for the person named in the policy, who was described as "[y]ou, your, yourself means the person named on the Declarations page and includes the spouse if a resident of the same household. This also means a member of the family who is a resident of the household and includes a ward or foster child." *Matthews,* 25 P.3d at 452. The terms "family" and "member of the family" were not defined in the policy. *Id.* at 453. The court concluded that, in the context of the policy, the average insured would read "family" in the traditional sense, that is "connected by blood, affinity or law." *Id.*

9. The policy defined the term "relative" as "a person related to the named insured by blood, marriage or adoption, including a ward or foster child, who is a resident of the same household." *Gile,* 524 S.E.2d at 645. While the court looked to Virginia statutory law in determining the meaning of the term "foster child" when determining the scope of the term for the purpose of underinsured motorist coverage, it looked to the context in which the term is used in determining the scope of medical benefits coverage. *Id.* at 664–65, 524 S.E.2d 642.

**222**

(1990)(finding "[t]he word 'includes' relates back to the words 'by blood, marriage or adoption.' The latter words connote legal bonds rather than [an] informal status").[10] As noted by the Court of Appeals of Washington in *Matthews:*

> If "context" means all the possible dictionary definitions, it is meaningless. To be meaningful, context must refer to the context of Penn–America's policy. Thus, we consider all appropriate dictionary meanings of "family" and then look to the words and phrases surrounding "family" in Penn–America's policy to guide us to the meaning of "family" in that context. And this requires us to consider the limiting effect of Penn America's use of "spouse," "ward," and "foster child."

*Matthews,* 25 P.3d at 454. Defining a term in an insurance policy with reference to the context in which it is used is consistent with West Virginia law which requires that a policy be read as a whole, giving meaning to each term. *Soliva,* 176 W.Va. at 432, 345 S.E.2d at 35. We find the analysis utilized by these courts to be persuasive and thus, hold the terms "ward" and "foster child" as used in the context of the definition of "family member" in an automobile insurance policy are terms which describe a legally recognized relationship.

 Having found that the terms "ward" and "foster child" as used in the definition of the term "family member" describe legally recognized relationships, we must determine whether Johnny Combs' relationship with Billie Joe Smith is a legally . recognized "ward" or "foster child" relationship under West Virginia law. West Virginia statutory law recognizes two types of guardian-ward relationships. First, a guardian may be appointed for a minor via a testamentary ap-

pointment by the minor's parent or by the circuit court or family court of the county in which the minor resides or in which the minor has an estate, if such appointment is in the minor's best interest. W. Va.Code 44–10–1 (1923); W. Va.Code 44–10–3 (2004). A minor is defined, under West Virginia law, as a person under the age of eighteen years. W. Va.Code 2–2–10(aa)(1998). Secondly, a guardian may be appointed for a "protected person", defined as "an adult individual, eighteen years of age or older, who has been found by a court, because of mental impairment, ..." W. Va.Code 44A–1–2 (1994). As Combs was over the age of eighteen at the time of the accident at issue, he could not qualify as a ward unless he is also a "protected person." There is no evidence before this Court that Combs has been adjudicated to be a "protected person" for whom Billie Joe Smith has been appointed as guardian. Therefore, Combs cannot reasonably be considered a "ward" of Billie Joe Smith under the terms of the Glen Falls policy.[11]

 More problematic is the determination as to whether Combs, a twenty-two year old man who has a history of gainful employment, may reasonable be considered to be Billie Joe Smith's "foster child." Combs argues that in today's society, the term "foster child" should not be limited to those individuals formally placed by the State in another's home, but should include persons who are cared for and supported by persons other than their natural parent regardless of age. In support of this argument, Combs quotes at length the opinions in *Sigel v. New Jersey Mfr. Ins. Co.,* 328 N.J.Super. 293, 745 A.2d 602 (2000), and *United Services Auto. Assoc. v. Gambino,* 114 N.C.App. 701, 443 S.E.2d 368 (1994).[12]

**10.** The policy at issue defined the term "household member" as "anyone living in your [i.e., that of the named insured] household who is related to you by blood, marriage or adoption. This includes wards or foster children." *Pisani,* 560 N.E.2d at 155–6.

**11.** This Court is not currently presented with a situation wherein the guardianship of a minor child has been transferred to another by the minor's biological parent by execution of a verified or notarized document, though not court approved. Therefore, the Court reserves for another day an opinion as to whether, in such a

circumstance, the minor would qualify as a "ward" for purposes of the guardian's automobile insurance policy.

**12.** The opinions quoted were, in essence, set forth in their entirety in Appellant's brief, as Appellant's argument without acknowledgment that the language therein derive from a published opinion. The Court takes this opportunity to remind parties that extensive quotes of court opinions used in support of a party's position should be clearly identified as a quote, including the use of the appropriate citations.

The first of these two cases is readily distinguishable. In *Sigel*, the New Jersey court was presented with the question as to whether the term "related by marriage" within the definition of "family member" encompassed step-siblings. *Sigel*, 745 A.2d at 603. Therein, the court held that the term "related by marriage" encompasses step-siblings and that there was "no need to add economic dependence as a required criterion." *Id.* at 605. *Sigel* did not involve the question of whether a person constitutes a "foster child."

More closely on point is the decision in *Gambino*, wherein the court found a question of fact existed as to whether the claimant constituted a "foster child" of an insured, thereby precluding summary judgment in favor of the defendants. *Gambino*, 443 S.E.2d at 372. The alleged foster child in *Gambino* was a nineteen year old college student who had lived with the insured since before his high school graduation, who returned to the insureds' home during school breaks and who received food and spending money from the insureds, in addition to utilizing the insureds' family vehicle. *Id.* at 370. The court in *Gambino* found the term "foster child" referred to a sociological relationship independent of a person's age and means a "person whose upbringing, care and support has been provided by someone not related by blood or legal ties and who has reared the person as his or her own child." *Id.* at 371-2. The

court did not, however, examine the term "foster child" in the context of the remaining terms in the definition of "family member", recognizing, as we have, that each refers to a legally recognized relationship.[13] Instead, the court took the term out of context and, looking to dictionary definitions, adopted a definition which is not a legally recognized relationship.

■ Even if it were applicable, we decline the invitation to follow the *Gambino*[14] decision. The context in which the term "foster child" is used in the Glen Falls policy is determinative of its meaning. This Court is more persuaded by the ample case law viewing the term in context and considering both the existence of a legally recognized relationship and the "foster child's" age. *See, e.g., Virginia Farm Bureau Mut. Ins. Co. v. Gile*, 259 Va. 164, 524 S.E.2d 642, 645 (2000)(looking to Virginia statutory law. to determine scope of foster relationship); *Wheeler v. Rocky Mtn. Fire & Cas. Co.*, 124 Wash.App. 868, 103 P.3d 240, 243 (2004)(finding "reasonable meaning for a foster child means a child under the age of 18"); *Congdon v. Automobile Club Ins. Co.*, 174 Vt. 586, 816 A.2d 504, 507 (2002)(holding, in light of statutes governing placement of foster children, the term "foster child" in automobile policy reasonable refers to child under the age of majority).

**13.** The Court in *Gambino* did, however, rely upon the decision in *Joseph v. Utah Home Fire Ins. Co.*, 313 Or. 323, 835 P.2d 885 (1992), which rejected the legal relationship analysis, finding that the term "foster child" was ambiguous in the context in which it was used. *Joseph*, 835 P.2d at 886–87. At issue was whether personal injury protection coverage and uninsured motorist coverage were available to a six-year old child living with her mother and the insured under the insured's policy. *Id.* at 885–86. The definition of "relative" in the Personal Injury Protection section of the policy was slightly different than the general definition of "family member" utilized for uninsured motorists coverage. The Personal Injury Protection definition included the phrase "related to the named insured by ...adoption (including a ward or foster child)". The general definition of "family member" stated "related to you by blood, marriage or adoption.... This includes a ward or foster child." *Id.* at 886. The court noted that the term "foster child" was grammatically related to the term "adoption" [in the Personal Injury Protection definition] and, as the definition of foster child

"specifies that a foster child is not related to the foster parent by adoption" an ambiguity is created. *Id.* Moreover, the court in *Joseph* expressly limited its holding to "construing the term under *this policy*" and "expressed no opinion as to the meaning of 'foster child' in any other context." *Id.* at 899, 835 P.2d 885 (emphasis in original). The ambiguity noted in *Joseph* is not created by the context in which the term is used in the Glen Falls policy at issue.

**14.** To adopt the reasoning employed by *Gambino* and urged by Combs would require this Court accord legal recognition to all types of "de facto" familial relationships, be it adult-child type relationships, common law marriages, or roommates who consider themselves to be like siblings. Where the legislature has not conferred legal recognition on a *de facto* relationship, this Court will likewise refuse to confer such legal recognition in determining the scope of available insurance coverage. See, W. Va.Code § 48–5–707 (2001) (reduction or termination of spousal support because of *de facto* marriage).

■■■ West Virginia statutory law also provides guidance as to whether Appellant Combs may reasonably, legally be considered a "foster child." Although, the West Virginia Code does not define the term "foster child", it repeatedly defines "child," "infant" and "minor" in the same manner—a person under the age of eighteen years.[15] *See, e.g.,* W. Va.Code 2-2-10(aa) (1998)(rules for construction of statutes); W. Va.Code 48-10-202 (2001)(Grandparent Visitation); W. Va.Code 48-20-102(b)(2001)(Uniform Child Custody Jurisdiction and Enforcement Act); W. Va. Code 49-1-2 (1999)(child welfare statutes); W. Va.Code 49-2A-1 (1975)(Interstate Compact on the Placement of Children)(defining "child" as "person who, by reason of minority, is legally subject to parental, guardianship or similar control"); W. Va.Code 49-2B-2(f) (2001)(outlining duties of commissioner of human services for child welfare); W. Va. Code 49-5-1 (1998)(juvenile proceedings); W. Va.Code 49-9-2 (1997)(Missing Children Information Act); W. Va.Code 61-8D-1 (1988)(child abuse). Considering these statutory definitions of the term "child" in light of West Virginia's child welfare statutes governing the placement of children with foster parents or in foster homes, W. Va.Code 49-1-1, *et seq.*, this Court concludes the term "foster child" refers to a person, under the age of eighteen years, who has been entrusted to the care of a person other than a biological parent or legal guardian, by a state agency. As Johnny Combs was twenty-two years of age at the time of the accident in question, he does not, by definition, qualify as a "foster child" of Billie Joe Smith. Moreover, even if Johnny Combs had been under the age of eighteen at the time of the accident, he was not involved in a legally recognized relationship with Billie Joe Smith pursuant to which he could legally be recognized as Billie Joe Smith's foster child. As such, the circuit court did not err in finding that Combs was not entitled to coverage under the underinsured motorist benefits of the Glen Falls policy.

## IV.

## CONCLUSION

For the foregoing reasons, we affirm the judgment of the Circuit Court of Wyoming County. Appellant Johnny Combs, can not reasonably be considered to be a "resident" of his mother's household so as to qualify for underinsured motorist benefits under the policy of insurance issued by GMAC. Likewise, Appellant Combs cannot reasonably be considered to be a "ward" or "foster child" of Billie Joe Smith so as to qualify for underinsured motorists benefits under the Glen Falls policy of insurance because Appellant Combs' relationship with Billie Joe Smith did not rise to the level of a legally recognized "ward" or "foster child" relationship.

### AFFIRMED

ALBRIGHT, Chief Justice, dissenting, in part, and concurring, in part.

I strongly disagree with the majority's affirmance of the lower court's grant of summary judgment in favor of Glen Falls Insurance Company[1] on the basis that Appellant was not the foster child of Mr. Smith at the time of the accident, because this result was reached by ignoring time-honored principles governing the interpretation of ambiguous terms in insurance policies and in complete disregard of the realities surrounding the

---

**15.** In footnote 10 of *Martin v. Randolph County Bd. of Educ.*, 195 W.Va. 297, 465 S.E.2d 399 (1995) we noted, "[a] canon of statutory construction called *noscitur a sociis*, which holds that a word is known by the company it keeps, is pertinent here. *Babbitt v. Sweet Home Chapter of Communities for a Great Oregon*, 515 U.S. 687, 115 S.Ct. 2407, 2411, 132 L.Ed.2d 597, 613 (1995); *Darlington v. Mangum*, 192 W.Va. 112, 450 S.E.2d 809 (1994); *Banner Printing Co. v. Bykota Corp.*, 182 W.Va. 488, 388 S.E.2d 844 (1989); *Wolfe v. Forbes*, 159 W.Va. 34, 217 S.E.2d 899 (1975). The fact that several items in a list share an attribute counsels in favor of interpreting the other items as possessing that attribute as well." *Martin v. Randolph County Bd. of Educ.*, 195 W.Va. 297, 311, 465 S.E.2d 399, 413 (1995). Though the doctrine of *noscitur a sociis* generally is invoked in interpreting words contained in a single statute, we believe its principles may here be invoked to recognize that where the Legislature consistently defines a term in a certain manner throughout the West Virginia Code, the term should receive a consistent interpretation where it has not otherwise been defined.

**1.** Glen Falls Insurance Company is hereinafter referred to as "Glen Falls."

human relationship of foster child and foster parent. I have serious concern with the analysis used by the majority not only because of the specific result reached in this case, but also because it casts doubt on the vitality of two firmly rooted principles in our law—that an insurance contract will be construed in favor of the insured and that a term not defined within an insurance policy will be given its ordinary meaning.

The Glen Falls portion of this case involves the meaning of the term foster child as it appears within the four corners of an insurance policy, *not* as it appears in statutes setting forth the state's responsibility to protect abused and neglected children. I submit that the term "foster child" in the context of this case involves the human relationship of a foster child and foster parent, not a legal relationship created by the state removing a child from its home. This conclusion is reached based on traditional methods this Court has employed in analyzing ambiguous terms in an insurance contract.

The term "foster child" which is included in the definition of "family member" is not defined in the insurance policy at issue. Given the uncertainty regarding its meaning, "[i]t is well settled law in West Virginia that ambiguous terms in insurance contracts are to be strictly construed against the insurance company and in favor of the insured." Syl. Pt. 4, *National Mut. Ins. Co. v. McMahon & Sons, Inc.*, 177 W.Va. 734, 356 S.E.2d 488 (1987), *overruled on other grounds, Potesta v. U.S. Fidelity & Guar. Co.*, 202 W.Va. 308, 504 S.E.2d 135 (1998). In applying this standard, we give "[l]anguage in an insurance policy ... its plain and ordinary meaning," and the interpretation is made from the standpoint of "a reasonable person in the insured's position." Syl. Pts. 1 and 4, *Soliva v. Shand, Morahan & Co., Inc.*, 176 W.Va. 430, 345 S.E.2d 33 (1986) (citation omitted), Syl. Pt. 1 *overruled on other grounds, National Mut. Ins. Co. v. McMahon & Sons, Inc.*, 177 W.Va. 734, 356 S.E.2d 488 (1987). *See also* Restatement (Second) of Contracts § 211 comment e ("[C]ourts in construing and applying a standardized contract seek to effectuate the reasonable expectations of the average member of the public who accepts it."). This standard was established in large part because insurance contracts are usually contracts of adhesion where the insured is not in the position to negotiate the terms of the policy with the insurer. *See Mitchell v. Broadnax*, 208 W.Va. 36, 537 S.E.2d 882 (2000); *Auber v. Jellen*, 196 W.Va. 168, 469 S.E.2d 104 ( 1996).

The plain and ordinary meaning of a term such as foster child is generally found in a common dictionary. The phrase "foster child" is defined under the word "foster" in *The American Heritage Dictionary of the English Language* (1969) as "receiving, sharing, or affording parental care and nurture *although not related through legal or blood ties.*" *Id.* at 519 (emphasis added). Such a common sense reading has been applied by a number of courts over the years. *See e.g. In re Norman's Estate*, 209 Minn. 19, 295 N.W. 63 (1940); *Joseph v. Utah Home Fire Ins. Co.*, 313 Or. 323, 835 P.2d 885, 888 (1992) ("In the common understanding, the defining relationship is one of nurturing, supporting, rearing—one of fostering—and not necessarily a 'legal relationship.'"); *see also* 66 A.L.R. 5th 269 § 12, Annotation, *Who is "Member" or "Resident" of Same "Family" or "Household" within No-fault or Uninsured Motorist Provisions of Motor Vehicle Insurance Policy* (1999) (compilation of cases). This straightforward definition also reflects common experience.

Over the years many people with large hearts and wise ways have reached out to feed, clothe, shelter, nurture and love children not born of them, adopted by them or otherwise legally related to them. In turn, many of those children have in their adult years returned that love so freely given—hence establishing the actual lifetime relationship of foster child and foster parent. Such relationships are not necessarily dependent on state intervention by our courts or our governmental agencies. The Glen Falls insurance policy—as it defined family member—may be easily read to include such non-legal relationships by reason of its use of the term "foster child." The undisputed facts in this case clearly demonstrate that Appellant and Mr. Smith shared a *human* relationship which comports with the ordinary or commonly held definition of foster child/foster father. At the time relevant to this case, Mr.

Smith provided Appellant, at the least, shelter, some monetary support, companionship, shared meals and shared time.

Rather than looking to the plain meaning of the term "foster child," the majority announced in syllabus point five that "the terms 'ward' and 'foster child' as used in the definition of 'family member' in an automobile insurance policy ... [are limited in meaning to] a legally recognized relationship."[2] It is hard to believe that a common person in the same position as Mr. Smith when he obtained the insurance policy would believe that some "legally recognized relationship" had to be in place in order to afford protection through the policy to those who were members of his household. The reasoning of the majority hardly favors the insured. I find it most difficult to understand why the majority, members of this Court who have given careful attention to honoring the best interests of families and family structures, could come to a conclusion which negates the human relationship that exists between a foster parent and foster child in order to deprive an insured person the benefits of an insurance contract purchased to protect himself and the members of his real family. The relationship of foster child and foster parent *may be* created in the course of a statutory abuse and neglect proceeding by court order, *but* long before this State created such proceedings, the foster child/foster parent relationship has been and continues to be forged by the freely given and received acts of love and caring common to many such relationships without any governmental involvement at all.

The majority also found that even if Mr. Smith had established the legally recognized relationship of foster child/foster parent, Appellant's age precluded coverage under the insurance policy because he was beyond the age of eighteen at the time the accident occurred. The age restriction makes no sense in the context of the other relationships listed in the policy because had Appellant been the adult child of the insured through blood, marriage or adoption and resided with the insured, then he would have clearly fallen within the insurance policy's internal definition of family member regard-

less of age. The majority's reliance on the fact that Appellant was over the age of majority as further reason for denying insurance coverage simply makes no sense in the context of the policy or the expectations of the insured.

While the foregoing reflects my serious reservations with the outcome involving the Glen Falls policy, I concur with the majority's affirmance of the lower court's grant of summary judgment for GMAC Insurance Company as the facts do not show that Appellant was a resident of his biological mother's household on the date of the accident for which he sought underinsured motorist coverage. Accordingly, I dissent, in part, and concur, in part, with the majority opinion.

STARCHER, J., concurring, in part, and dissenting, in part.

I concur with the majority's conclusion that GMAC Insurance Company had no duty to provide coverage to Johnny Combs. As this Court held in *Farmers Mutual Ins. Co. v. Tucker*, 213 W.Va. 16, 576 S.E.2d 261 (2002), a person can be an insured "resident" of multiple households for purposes of insurance coverage, and whether residency has been established is *usually* a question of fact for jury resolution. But to get by the summary judgment stage, the person has to make out a *prima facie* case of residency. There just wasn't anything in this record to convince me that Mr. Combs wasn't anything more than an occasional visitor to his mother's house. GMAC Insurance Company therefore had no responsibility to provide Johnny with coverage under his mother's insurance policy.

I dissent, however, to the majority's anti-family conclusion that Johnny Combs could never be an insurable resident of the household of Billie Joe Smith, Johnny's former stepfather. The majority opinion is based on the erroneous conclusion that "there has never been a legally recognized relationship" between Johnny Combs and Mr. Smith. This conclusion ignores long-standing precedent. It also establishes a short-sighted pub-

2. I assume the majority does not intend to interfere with the rights of parties to a contract to agree to a *different definition of these terms.*

lic policy that increases insurance company profits at the expense of innocent children whose loving caretakers are ignorant of legal niceties. The lower court's grant of summary judgment to Glen Falls Insurance Company should have been reversed.

Nobody disputes the fact that Johnny Combs was ignored by his biological father, and that his biological mother put more time into her own healthcare than into raising Johnny. Instead, Johnny lived in Mr. Smith's house for upwards of fourteen years and called Mr. Smith his "dad." Mr. Smith reciprocated and raised the boy as his own son. Anybody who looked at this situation would applaud the fact that a biological stranger to Johnny stepped forward and took on the moral, financial and emotional burden of raising this young man.

In times past, this Court has recognized the existence of these informal parent-child relationships, and given these relationships equitable legal status. For most other legal situations, Johnny Combs would be considered a "resident" of his former stepfather's household.

The majority opinion takes a step back and says "so what" and punishes Mr. Combs for the sins of his biological father and mother. Johnny Combs is also punished because his "adopted" father, Mr. Smith, didn't hire a team of lawyers to terminate the parental rights of those biological parents and formally adopt the boy. Mind you, this punishment extends only to protecting insurance companies by denying Johnny Combs un-or under-insured insurance coverage through Mr. Smith's policy. To impose this punishment on Johnny Combs, the majority opinion ignores well-established law that makes Johnny's and Mr. Smith's situation a "legally recognized relationship."

In 1978, this Court first recognized that Mr. Combs could potentially inherit from Mr. Smith's estate upon Mr. Smith's death. In *Wheeling Dollar Savings & Trust Co. v. Singer*, 162 W.Va. 502, 250 S.E.2d 369 (1978), we found a person could prove they had been "equitably adopted" by a decedent by showing that, from an age of tender years, they had stood in a position exactly equivalent to that of a formally adopted or natural child. If the person showed they had been equita-

bly adopted by the decedent, then the person could inherit just as could a formally adopted or natural child. This rule was crafted in recognition of the fact that many "informal" parent-child relationships arise in our society, relationships that are never given a statutory or legal imprimatur:

> While formal adoption is the only safe route, in many instances a child will be raised by persons not his parents from an age of tender years, treated as a natural child, and represented to others as a natural or adopted child. In many instances, the child will believe himself to be the natural or formally "adopted" child of the "adoptive" parents only to be treated as an outcast upon their death. We cannot ascertain any reasonable distinction between a child treated in all regards as an adopted child but who has been led to rely to his detriment upon the existence of formal legal paperwork imagined but never accomplished, and a formally adopted child. Our family centered society presumes that bonds of love and loyalty will prevail in the distribution of family wealth along family lines, and only by affirmative action, i.e., writing a will, may this presumption be overcome. An equitably adopted child in practical terms is as much a family member as a formally adopted child and should not be the subject of discrimination. He will be as loyal to his adoptive parents, take as faithful care of them in their old age, and provide them with as much financial and emotional support in their vicissitudes, as any natural or formally adopted child.

162 W.Va. at 508, 250 S.E.2d at 373.

In addition to ignoring Johnny Combs' potential rights to inherit from Mr. Smith as his equitably adopted child, the majority opinion also ignores Mr. Smith's status as a "psychological parent" to Johnny Combs. We recently stated, in Syllabus Point 3 of *Tina B. v. Paul S.*, 217 W.Va. 625, 619 S.E.2d 138 (No. 31855, June 17, 2005), that

> A psychological parent is a person who, on a continuing day-to-day basis, through interaction, companionship, interplay, and mutuality, fulfills a child's psychological and physical needs for a parent and pro-

vides for the child's emotional and financial support. The psychological parent may be a biological, adoptive, or foster parent, or any other person. The resulting relationship between the psychological parent and the child must be of substantial, not temporary, duration and must have begun with the consent and encouragement of the child's legal parent or guardian.

Mr. Smith appears to have fit the bill as Johnny Combs' "psychological parent," and as such had clear legal standing to act as his "parent." The majority's opinion takes a disastrous public-policy detour away from *Tina B.* and says that while Mr. Smith could provide for the boy's "emotional and financial support," he could not provide him with insurance coverage.[1] This result is not only absurd, but dangerous to the well-being of children who are being raised by someone who is not their biological or legal guardian.

Last, but not least, in 1988 this Court held that stepchildren—who do not have a "legally recognized relationship with the purported parent or guardian"—can be considered as "children" of the parent or guardian for purposes of being beneficiaries of a life insurance policy. In *Transamerica Occidental Life Ins. Co. v. Burke*, 179 W.Va. 331, 368 S.E.2d 301 (1988), a parent (Richard Wayne Nelson) was married twice. In the first marriage, the parent fathered three biological children. In the second marriage, no children were born, but for fifteen years the parent lived together with his wife and her three children from her prior marriage. When the parent died, he had an employee life insurance plan and an employee pension plan designating his wife as beneficiary of 50% of the death benefits under both plans. The other beneficiary was designated as "50%—children."

The issue before the Court in *Burke* was whether the term "children" meant only the natural children of the parent, or included the parent's stepchildren as well. The record indicated that the parent provided food, shelter, clothing and transportation for the stepchildren, disciplined the stepchildren, paid for health insurance for the stepchildren, and claimed the stepchildren as dependents on his income tax returns. The parent attempted to adopt the stepchildren, but before the adoptions could be completed, the parent "was laid off from his job and he decided, for financial reasons, not to pursue the adoptions until he was employed again." 179 W.Va. at 334, 368 S.E.2d at 304.

The Court conceded that the "term 'children' ordinarily does not include stepchildren, but it may include stepchildren when a contrary intent is found from additional language or circumstances." Syllabus Point 2, *Burke.* Looking to the parent's use of the term "children" when designating the beneficiaries to his death benefits, the Court found the designation ambiguous, and so turned to examine the parent's factual circumstances when he designated his beneficiaries. Looking at those circumstances, the Court concluded that the stepchildren were "children" who were entitled to share death benefits.

Why the majority opinion turned its back on these precedents is beyond me. The facts presented are substantial enough to show that Johnny Combs was, beyond question, a *de facto* "child" of Mr. Smith's. There are uncountable numbers of similar cases in this State, where children are being raised by caring grandparents, siblings, friends and neighbors. The majority opinion ignores the facts and ignores the true status of our society. The majority opinion imposes a rigid legalistic standard which does nothing to carry out any legislative policy, nothing to protect these voluntary caregivers, and nothing to protect these children.

The majority opinion is not "for the sake of the kids;" it is purely for the sake of insurance companies. I therefore respectfully dissent to that portion of the opinion pertaining to Glen Falls Insurance Company.

DAVIS, J., concurring.

I fully concur with the majority's Opinion in this case. Nevertheless, I feel the need to

---

**1.** While the majority's opinion is confined to un- and under-insured motorist coverage, I am horrified to think its reasoning may be extended—by insurance companies—to health insurance coverage. The result could be that untold numbers of guardians buying health insurance to protect their wards, only to learn upon filing a claim that because the *de facto* parent-child relationship has no formally recognized legal stamp of approval, the child is not entitled to coverage.

write separately to address the issues raised by my dissenting colleagues and to clarify the misconceptions that may arise therefrom.

Both of my dissenting brethren have suggested that coverage for Johnny Combs existed under Billie Joe Smith's Glen Falls policy of motor vehicle insurance because Johnny is Mr. Smith's "foster child" or "ward." With this position, I fervently disagree. In the first dissenting opinion, my colleague misapprehends the meaning of the term "foster child" as that phrase is intended by the subject policy language. *See generally* sep. op. of C.J. Albright. Explaining the longtime nurturing relationship that exists between Johnny and Mr. Combs, the dissent interprets the existing relationship between these two men as that of a foster child-foster parent arrangement. *See id.* Rather, the actual nature of the men's relationship is more in line with the status of a psychological parent relationship which we recently recognized in Syllabus point 3 of *Tina B. v. Paul S.*, 217 W. Va. 625, 619 S.E.2d 138 (No. 31855 June 17, 2005). The simple fact of the matter is, however, that the Glen Falls policy does not provide coverage for family members who enjoy merely a psychological relationship. The only familial relationships that may beget coverage in the instant proceeding are those of "foster child" and "ward," neither of which definitions Johnny can satisfy.

More importantly, in explaining the alleged foster parent-foster child relationship between Mr. Smith and Johnny, my dissenting colleague overlooks a critical fact: the definition of a "foster child" presupposes that that person is a "child." Under the facts before the Court, it is clear that Johnny is not a child and thus is not Mr. Smith's "foster child." In defining the term "child," Black's Law Dictionary states that a "child" is, "[a]t common law, a person who has not reached the age of 14, though the age now varies from jurisdiction to jurisdiction." Black's Law Dictionary 232 (7th ed.1999). Thus, un-

der this definition, a child is anyone under the age of 14, if not provided for differently by statutory law. By statute and as a general matter, in West Virginia a "child" "means any person under eighteen years of age." W. Va.Code § 49–1–2 (1997) (Repl.Vol.2004).[1]

Incorporating this definition of the word "child" into the dissenter's construction of the term "foster child" to arrive at a complete interpretation thereof suggests that the plain, ordinary meaning of the phrase "foster child" contemplates any person under the age of eighteen who is "receiving ... parental care and nurture *although not [from someone who is] related through legal or blood ties.*" Sep. op. of C.J. Albright, 217 W.Va. at 225, 617 S.E.2d at 772 (emphasis in original) (internal quotations and citations omitted). Applying this definition to the facts before the Court, the record in this case is quite clear that Johnny was twenty-two years old when the accident occurred. Thus, even under the most liberal interpretation of the term "foster child" it is clear that Johnny is not and was not a "foster child" under Mr. Smith's Glen Falls policy and, thus, was not entitled to coverage thereunder. Any other construction would yield the absurd result of denominating a twenty-two year old man, who has no mental impairments, a child for the limited purpose of insurance coverage when, for all other intents and purposes, this same twenty-two year old man is a full-fledged adult and functioning member of society. The majority was correct to reject such an interpretation. *See Legg v. Johnson, Simmerman & Broughton, L.C.*, 213 W.Va. 53, 59, 576 S.E.2d 532, 538 (2002) (per curiam) ("[T]he law itself indicates that [policy language] should not be construed to reach absurd results." (citation omitted)).

The second dissenter suggests, instead, that the Court should have afforded "ward" or "foster child" status to Johnny because he is the *de facto* child of Mr. Smith, or, alternatively, because Mr. Smith is Johnny's psycho-

---

1. A few exceptions to this general rule do exist. *See, e.g.,* Syl. pt. 1, in part, *State ex rel. Dep't of Health & Human Res., Bureau of Child Support Enforcement v. Farmer,* 206 W.Va. 249, 523 S.E.2d 840 (1999) ("A child [over or] under the age of sixteen who marries shall be emancipated by operation of law from his or her parents[.]");

*Facilities Review Panel v. Greiner,* 181 W.Va. 333, 336, 382 S.E.2d 527, 530 (1989) ("[Y]ouths between the ages of eighteen and twenty who are subject to continuing juvenile jurisdiction under *W. Va.Code,* 49–5–2 [1978] are defined as children for purposes of article 49, *W. Va.Code* [.]").

logical parent. *See generally* sep. op. of J. Starcher. While my colleague can apparently conceive of the aforementioned constructions of the subject policy of insurance so as to afford coverage where coverage does not, in fact, exist, such constructions are plainly wrong. When interpreting the language of an insurance policy, we are constrained to limit our consideration to the terms employed by the contract. *See Tackett v. American Motorists Ins. Co.*, 213 W.Va. 524, 528, 584 S.E.2d 158, 162 (2003) ("[T]he terms of the pertinent insurance contract govern the parties' relationship and define the scope of coverage[.]"). Unfortunately, however, neither the term "*de facto* child" nor the phrase "psychological parent" refers to cognizable familial relationships for which coverage is provided under the Glen Falls policy.

First, my dissenting colleague suggests that because Johnny was Mr. Smith's *de facto* child coverage should have been provided by the policy. On this point, I disagree and reaffirm my belief that the majority Opinion correctly decided this issue. The policy language in question simply does not provide coverage for a *de facto* child; such a relationship is not among the enumerated relationships under which coverage may be had. Whether Johnny may or may not have been Mr. Smith's *de facto* child is not a matter presently before the Court; whether he is a foster child or a ward is. Because the policy language at issue does not afford coverage to an insured's *de facto* child, this Court is not permitted to view the policy in this manner or to rewrite the policy to give it such effect. In short, rewriting insurance policies is not and has never been the role of this Court. *See Payne v. Weston*, 195 W.Va. 502, 507, 466 S.E.2d 161, 166 (1995) ("We will not rewrite the terms of the policy; instead, we enforce it as written."). Stated otherwise, this Court's authority to construe language in an insurance policy is not a "license ... to ... rewrite [policy] language on the basis that, as written, it produces an undesirable ... result." *Taylor–Hurley v. Mingo County Bd. of Educ.*, 209 W.Va. 780, 788, 551 S.E.2d 702, 710 (2001). The majority resisted such temptation and with that course I wholeheartedly agree.

My dissenting colleague alternatively suggests that coverage exists under the Glen Falls policy because Mr. Smith is Johnny's psychological parent and that to find, as the majority did in Syllabus point 5, that coverage is provided only for the "legally recognized relationship[s]" of "ward" and "foster child" strays from this Court's recent decision in *Tina B. v. Paul S.*, 217 W. Va. 625, 619 S.E.2d 138 (No. 31855 June 17, 2005). This reasoning is misplaced and misinterprets the full import of *Tina B*. In that case, we very clearly and explicitly found that a psychological parent is *not* a legal parent within the contemplation of W. Va.Code § 48-1-232 (2001) (Repl.Vol.2004).

Furthermore, the dissent suggests also that "Mr. Smith appears to have fit the bill as Johnny Combs' 'psychological parent,' and as such had clear legal standing to act as his 'parent.'" Sep. op. of J. Starcher, 217 W.Va. at 229, 617 S.E.2d at 775. Again, however, the express meaning of the *Tina B.* opinion has been misunderstood. In *Tina B.*, this Court did *not* find that a psychological parent has standing to act as a child's parent in the limited custodial proceeding context within which that case was decided. Rather, *Tina B.* qualifiedly found that, "*[i]n exceptional cases and subject to the court's discretion,* a psychological parent *may intervene* in a custody proceeding brought pursuant to W. Va.Code § 48-9-103 (2001) (Repl.Vol.2004) when such intervention is likely to serve the best interests of the child(ren) whose custody is under adjudication." Syl. pt. 4, *Tina B.*, 217 W. Va. 625, 619 S.E.2d 138 (emphasis added). Such limited right of potential intervention is vastly different from the unlimited standing which Tina B. sought in that case and which my dissenting colleague seems to suggest we recognized therein.

Finally, as I explained with regard to the dissent's *de facto* parent argument, the policy language at issue in this case does not provide coverage for the psychological child of an insured. In the absence of the enumeration of such a familial relationship as a basis for coverage, the majority correctly abstained from conducting such an inquiry to determine whether, in fact, such a relationship exists and, if it does, extending coverage on this basis.

For the foregoing reasons, I respectfully concur with the Opinion of the Court.